# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00467-CV

**Debra Faye Taylor, Devin Wesley Costine, and Lori Carpenter, Appellants**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

**FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 190,112-B, HONORABLE GORDON G. ADAMS, JUDGE PRESIDING**

## O P I N I O N

This is an appeal from a final decree terminating the parental rights of a child's biological parents, denying conservatorship to the paternal grandmother, and awarding sole conservatorship to the Texas Department of Protective and Regulatory Services. Lori Carpenter and Devin Wesley Costine are the biological parents of D.A.C., an infant girl, and Debra Faye Taylor is her paternal grandmother. Currently, D.A.C. is under the foster care of Jose and Susy Ramirez, who are prepared to adopt her. Carpenter, Costine and Taylor each present separate issues on appeal. We will affirm.

## BACKGROUND

The trial record contains extensive testimony concerning the circumstances leading up to the termination of Carpenter's and Costine's parental rights. It is ultimately unnecessary to

reproduce many of these personal facts due to the procedural posture of the appeal, but we note them to the extent needed to place the present dispute in context.

Appellant Lori Carpenter had been on her own since age thirteen, living in a succession of locations and households. Between 1998 and 2000, she lived with appellant Devin Costine, then her boyfriend, and the couple resided off and on with Costine's mother, appellant/intervenor Debra Taylor. During this period, the teenagers conceived and gave birth to two children, the first in 1998 and the second, D.A.C., the child at issue in this appeal, in 2000. The record indicates that the Department took custody of their first child after an incident, sometime before D.A.C. was born, in which the first child had nearly died from an asthma attack and the treating hospital referred Carpenter to the Department on suspicion of abuse or neglect.[1] Both Carpenter's and Costine's parental rights to their first child were ultimately terminated in mid-2002.

In light of these circumstances and others, the Department closely monitored D.A.C.'s welfare from the date of her birth. It took temporary custody of D.A.C. roughly one week later, after Carpenter left the child with Carpenter's father, whom the Department believed presented a risk of abuse. Efforts to reunite Carpenter and D.A.C. in a residential treatment setting failed; after Carpenter threatened to leave the facility with D.A.C., the Department took custody of the child and initiated termination proceedings against Carpenter.

---

[1] The child had severe asthma requiring medication. Nonetheless, Carpenter had left the child with a babysitter without explaining the child's condition or providing medication. The child had an asthma attack and, after the babysitter could not locate Carpenter, the babysitter took the child to the hospital, saving her life.

Costine initially was not believed to be D.A.C.'s father. He had been incarcerated since 2001, after his probation for a 2001 aggravated robbery was revoked following an episode later that year in which he beat Carpenter and allegedly pointed a gun at her.[2] By the time D.A.C. was born a few months later, Carpenter was living with a new boyfriend, who took responsibility for the child, although Carpenter believed that a third man was most likely the biological father.

The trial court ordered paternity testing of each prospective father and, in late 2002, Costine was identified as D.A.C.'s father. The Department then initiated termination proceedings against Costine. After the revelation that Costine had fathered D.A.C., Taylor, Costine's mother, intervened in the termination proceeding seeking to be named sole managing conservator.

The case was tried to a jury, which heard evidence regarding the removal of D.A.C. from Carpenter's custody and the fitness of Carpenter, Costine and Taylor as parents. Of relevance here, the Department elicited testimony that Taylor has used illegal drugs from at least the 1980s until as recently as two years prior to trial and that she had two drug-related criminal convictions, one of which was a felony. The Department also questioned Taylor's parenting skills, pointing out the extensive criminal record of her son, Costine, and suggesting that Taylor allowed the teenaged Carpenter and Costine to have a sexual relationship while living in her home, resulting in the conception of two children.

While acknowledging that she had made past mistakes, Taylor insisted that she had turned her life around during her two-and-a-half year relationship with Gary Russell, with whom she

---

[2] Costine also admitted to prior convictions for unlawfully carrying a weapon and possession of a controlled substance, as well as a drug addiction.

3

proposed to raise the child. Russell was credited with being a stabilizing influence on Taylor's life, and several positive character witnesses testified on his behalf and that of Taylor. Taylor also insisted that D.A.C. should be raised by family members, especially because she and the child were of Native American descent.[3] Taylor and Russell urged that they loved the child, had the financial means to care for her, and had an extensive network of family and friends upon which they could rely to assist them in caring for the child.

D.A.C.'s foster parents, Jose and Susy Ramirez, both testified that they wanted to adopt the child. At time of trial, the couple had been married thirty-two years and had three children ages sixteen, seventeen, and nineteen. Their oldest son attended Central Texas College and worked at Home Depot; the two younger children were in high school. Mr. Ramirez testified that none of their children had ever been in trouble or used drugs. The Ramirezes both testified that their children got alone very well with D.A.C. and loved her. Mrs. Ramirez testified that they were teaching D.A.C. to speak both Spanish and English, but Spanish was the primary language spoken in the home. There was evidence that D.A.C. had Hispanic ancestry.

The Ramirezes said that they had been foster parents since 1997 and estimated that a total of thirty children had been placed in their home. They had never adopted a foster child. D.A.C. was eighteen months old at the time of trial and she had been in the Ramirezes' home since she was a young infant. D.A.C. called Mrs. Ramirez "mama" and Mr. Ramirez "poppy"; she knew

_____

[3] The record indicates that while the parties petitioned various tribal courts, none asserted jurisdiction over the case. *See* 25 U.S.C.A. § 1911(b) (West 2001) (termination cases involving Indian children not domiciled on reservation shall be transferred to tribal court upon petition of either parent or Indian custodian or Indian child's tribe; transfer shall be subject to declination by the tribal court).

no one else as her parents. The Ramirezes both testified that they loved D.A.C. very much and that she was already a part of their family. Mrs. Ramirez testified that the couple began wanting to adopt D.A.C. soon after she was placed in their home.

The jury found that the parental rights of both Carpenter and Costine should be terminated and that managing conservatorship should be awarded to the Department alone and not to Taylor. The district court rendered judgment on the verdict. Carpenter, Costine, and Taylor each appealed.

## DISCUSSION

**Termination of parental rights**

### *Standards for terminating the parent-child relationship*

An individual's parental rights may be terminated only if the state proves and the trial court finds by clear and convincing evidence (1) that the parent engaged in conduct constituting at least one of the statutory termination grounds enumerated in section 161.001(1) of the family code; and (2) termination is in the child's best interest. Tex. Fam. Code Ann.§ 161.001 (West 2002); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Some of the common factors that courts use to evaluate the best interests of a child in a given case are: (1) the emotional and physical needs of the child now and in the future; (2) any emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the programs available to assist those individuals to promote the best interest of the child; (5) the plans for the child by those individuals or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a

proper one; and (8) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544

S.W.2d 367, 372 (Tex. 1976); *Leal v. Texas Dept. of Protective & Regulatory Servs.*, 25 S.W.3d 315,

321 (Tex. App.—Austin 2000, no pet.). This is not an exhaustive list and other factors also may be

considered where appropriate. *Holley*, 544 S.W.2d at 372.

### *Carpenter's appeal*

Carpenter is represented on appeal by court-appointed counsel who has filed an

*Anders* brief on her behalf concluding that, after thorough review of the record, her appeal of the

termination of her parental rights is frivolous and without merit.[4] The brief presents a professional

---

[4] "*Anders* brief" refers to a brief filed in accordance with *Anders v. California*, 368 U.S. 738, 741-44 (1967). In *Anders*, the United States Supreme Court held that a court-appointed defense attorney in a criminal case who determines, after fully examining the record, that an appeal is wholly frivolous and without merit must so advise the appellate court and then set forth any potential points of error and applicable law that might arguably support the appellant's position. Several of our sister courts of appeals have acknowledged that *Anders* briefs may be appropriate in parental termination cases. *See In re D.E.S.*, 135 S.W.3d 326, 329 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *In re K.D.*, 127 S.W.3d 66, 67 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Porter v. Texas Dep't of Protective & Regulatory Servs.*, 105 S.W.3d 52, 56 (Tex. App.—Corpus Christi 2003, no pet.); *In re K.M.*, 98 S.W.3d 774, 777 (Tex. App.—Fort Worth 2003, no pet.); *In re E.L.Y.*, 69 S.W.3d 838, 841 (Tex. App.—Waco 2002, no pet.); *In re K.S.M.*, 61 S.W.3d 632, 634 (Tex. App.—Tyler 2001, no pet.). Likewise, this Court has considered the *Anders* procedure in unpublished termination cases. *See Prewitt v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00648-CV, 2002 Tex. App. LEXIS 7765 (Tex. App.—Austin Oct. 31, 2002, no pet.) (not designated for publication); *Behrends v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00614-CV, 2002 Tex. App. LEXIS 4463 (Tex. App.—Austin June 21, 2002, no pet.) (not designated for publication).

Although the Texas Supreme Court has not yet squarely addressed this issue, it has suggested in several decisions that it would likely approve the use of *Anders* briefs in parental termination cases. In *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003), the court held that the Sixth Amendment right to counsel applied to parental termination cases. In *In re D.A.S.*, 973 S.W.2d 296, 299 (Tex. 1998), the court extended *Anders* to juvenile delinquency proceedings on the basis that their quasi-criminal nature implicated the Sixth Amendment right to counsel. The rationale of *D.A.S.*—that *Anders* applied to appointed counsel in non-criminal contexts where the Sixth

evaluation of the record demonstrating why there are no arguable grounds for reversal. A copy of this brief was delivered to Carpenter, who was notified of her right to seek other counsel or file a *pro se* brief, which she has not done. We have throughly reviewed the record and agree with counsel's assessment that Carpenter's appeal is frivolous and without merit.[5] We affirm the trial court's final decree terminating Carpenter's parental rights and grant her counsel's motion to withdraw.

### *Costine's appeal*

Costine brings a single issue complaining only that the trial court erred in submitting the controlling issue of whether his parental rights should be terminated in a single broad-form question. The question stated simply: "Should the parent-child relationship between **Devin Wesley Costine** and the child . . . be terminated?" and asked the jury to answer "yes" or "no." This question was preceded by an instruction that the jury could terminate Costine's parental rights if it found by clear and convincing evidence conduct constituting the following statutory termination grounds:

  (1)  that the parent has:

       . . . .

       (E)  engaged in conduct or knowingly placed the child with persons who
            engaged in conduct which endangers the physical or emotional well-being
            of the child;

---

Amendment is implicated—would seemingly also extend to termination cases, as *M.S.* held that the Sixth Amendment applies in those proceedings.

[5] Among other grounds, there is conclusive evidence that Carpenter's parental rights to her first child were terminated based on findings that she had endangered the child, *see* Tex. Fam. Code § 161.001(1)(D), (E) & (M) (West 2002), and there is legally and factually sufficient evidence that termination is in D.A.C.'s best interest. *Id.* § 161.001(2).

. . . .

> (H) voluntarily, and with knowledge of the pregnancy, abandoned the mother of the child beginning at a time during her pregnancy with the child and continuing through the birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child, and remained apart from the child or failed to support the child since the birth."

. . . .

> (M) had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state.

Tex. Fam. Code Ann. § 161.001(1)(E), (H), (M).  The instruction further advised the jury that, in order to terminate Costine's parental rights, it also had to find by clear and convincing evidence that termination of the parent-child relationship would be in D.A.C.'s best interests.  The court supplied a definition of "best interests" that tracked the *Holley* factors.  *See Holley*, 544 S.W.2d at 372.

Costine points out that this question, by incorporating multiple alternative grounds for termination, potentially enabled a jury to find that his parental rights should be terminated even if fewer than the required ten jurors found any one termination ground to be established.  He contends this violates his due process rights.  Costine acknowledges that the Texas Supreme Court approved this type of broad-form submission in *Texas Dept. of Human Serv. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990),[6] but urges that *E.B.* is no longer controlling (or should be reconsidered or harmonized) in light of the supreme court's more recent jury charge jurisprudence holding that valid

---

[6] Broad-form submission is also the exemplar in the Pattern Jury Charge.  *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Family* PJC 218.1B (2003).

8

and invalid liability theories should not be subsumed in a single broad form question. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387-90 (Tex. 2000); *see also Harris County v. Smith*, 96 S.W.3d 230, 232-34 (Tex. 2002).

Costine's appeal is foreclosed without need to reach this issue.[7] As for the first element of section 161.001's termination standard, there was undisputed and conclusive evidence at trial that Costine's parental rights to a child other than D.A.C. had been terminated for violations of subsections (D) or (E) of family code section 161.001, which itself is a statutory ground for terminating his rights as to D.A.C. *See* Tex. Fam. Code Ann. § 161.001(1)(M). As for the second element, Costine does not challenge the sufficiency of the evidence that termination would be in D.A.C.'s best interests. For these reasons, any error in the trial court's broad form submission regarding alternative statutory termination grounds would have been harmless. *In re J.F.C.*, 96 S.W.3d 256, 284 (Tex. 2002).[8] We affirm the trial court's final decree terminating Costine's parental rights.

---

[7] We acknowledge that the supreme court has yet to resolve this issue.

[8] We also note that this Court, in an unreported opinion, affirmed a similar jury submission on the grounds that *Casteel* was not implicated where there was sufficient evidence to support each of the statutory termination grounds asserted in the case. *Carr v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-03-00273-CV, 2004 Tex. App. LEXIS 92, at *17-19 (Tex. App.—Austin Jan. 8, 2004, pet. denied) (memorandum op.) (citing *In re J.M.M.*, 80 S.W.3d 232, 249-50 (Tex. App.–Fort Worth 2002, pet. denied)). Here, Costine does not dispute the sufficiency of the evidence of any of the termination grounds asserted against him. *Carr* would suggest, therefore, that *Casteel* is not implicated here. Moreover, this court has held that *Casteel* does not apply where the disjunctive submission tracks statutory language, as is the case here. *See Cox v. Texas Dep't of Protective & Regulatory Servs.*, No. 03–01-00511-CV, 2002 Tex. App. LEXIS 3651, at *7 n.3 (Tex. App.—Austin May 23, 2002, pet. denied) (not designated for publication).

**Taylor's appeal**

Appealing the final decree awarding managing conservatorship to the Department and not to her, Taylor brings four issues. In her first three issues, Taylor urges that the trial court abused its discretion in admitting certain evidence that the Department used to attack Taylor's fitness as a parent: (1) a court-ordered home study prepared by a social worker recommending that D.A.C. not be placed with Taylor; (2) Taylor's 1990 felony conviction for delivery of marihuana and 1997 misdemeanor conviction for marihuana possession; and (3) Taylor's testimony at a pretrial hearing where she denied having her 1990 probation revoked, which the Department used to impeach her at trial. In her fourth issue, Taylor challenges the legal and factual sufficiency of the evidence to support the findings that it was in D.A.C.'s best interests that the Department should be appointed sole managing conservator and Taylor should not be appointed at least joint managing conservator.

### *Admission of the home study*

In her first issue, Taylor argues that the trial court abused its discretion in allowing into evidence a court-ordered home study prepared by a social worker.[9] At trial, Taylor raised a

---

[9] The district court ordered a social study of Taylor's home pursuant to section 107.051 of the family code, which authorizes a social study to be conducted of the home of any person seeking managing conservatorship of a child. *See* Tex. Fam. Code Ann. § 107.051(a), (b) (West 2002). The statute delegates to the Department the task of setting standards for conducting these studies, as well as establishing minimum qualifications for those conducting them. *Id*. § 107.052. A study may be conducted by a private entity, like in this instance, or by an individual appointed by the court or by the Department itself, even when the Department is also a party in the suit. *Id*. § 107.051(b). The study may be filed with the court and made a part of the record. *Id*. § 107.054. Disclosure of the contents of a home study to a jury must conform to the rules of evidence, and the court may compel the testimony of the author of a study at trial. *Id.* § 107.055 (a), (c). These social studies frequently contain a great deal of inadmissible hearsay. *See Rossen v. Rossen*, 792 S.W.2d 277, 278 (Tex. App.—Houston [1st Dist.] 1990, no writ). The purpose of the study is to allow the trial court to

*Robinson* challenge[10] to the admission of the home study on the basis that its author, Louie Payne, was not qualified to conduct the study or testify to her findings. The court redacted several portions of the study containing hearsay before admitting it into evidence as an exhibit. On appeal, Taylor asserts that the improper admission of this testimony amounted to reversible error. She complains that Payne's opinions and testimony are scientifically unreliable.

A trial court's decision that a witness is qualified as an expert is reviewed for an abuse of discretion. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex. 1998). A court abuses its discretion when it rules on the admissibility of evidence in an arbitrary or unreasonable manner or without reference to guiding legal principles or rules. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002); *In re J.B.*, 93 S.W.3d 609, 617 (Tex. App.—Waco 2002, pet. denied). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Rule 702 provides that a witness who qualifies as an expert because of knowledge, skill, experience, training, or education may testify as an expert if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or resolve an issue of fact. Tex. R. Evid. 702. Qualified experts may be allowed to testify to the ultimate issue in the case

---

obtain an independent assessment of a proposed placement. *Green v. Remling*, 608 S.W.2d 905, 909 (Tex. 1980) ("only those portions of the study which are admissible under the rules of evidence may be disclosed to the jury").

[10] *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) (establishing analytical framework governing qualifications of expert witnesses and requirements for assuring reliability of expert opinions).

if that testimony is otherwise admissible. Tex. R. Evid. 704. Deciding an expert's qualifications is a preliminary matter for the court to decide. Tex. R. Evid. 104(a); *Gammill*, 972 S.W.2d at 718.

To be admissible, expert testimony must be (1) uttered by a qualified expert; (2) relevant; and (3) based on a reliable foundation. *Helena Chem Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *In re C.D.K.*, 64 S.W.3d 679, 682-53 (Tex. App.—Amarillo 2002, no pet.). The courts have developed various factors to be considered in assessing reliability of an expert's conclusions. *See Gammill*, 972 S.W.2d at 720 (citing *Robinson*, 923 S.W.2d at 557).[11]

However, some cases involve situations that are not susceptible to scientific analysis, and the *Robinson* factors are not appropriate and do not strictly govern in those instances. *See Gammill*, 972 S.W.2d at 724 (distinguishing between "scientific" and "non-scientific" expert testimony); *see also In re K.A.C.*, No. 07-02-0393-CV, 2003 Tex. App. LEXIS 4838, at *8-9 (Tex. App.—Amarillo June 6, 2003, no pet.) (memorandum opinion) (applying *Gammill* in parental termination case because with non-scientific expert opinions "the *Daubert* test may not be appropriate because 'experience alone may provide a sufficient basis for an expert's testimony'"). The court of criminal appeals has recognized this dichotomy in criminal cases and has classified scientific expertise into two categories—"hard"sciences and "soft" sciences. *Nenno v. State*, 970

---

[11] The nonexclusive *Robinson* factors are: (1) the extent to which the theory or opinion has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory or opinion has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998); *Robinson*, 923 S.W.2d at 557; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-95 (1993).

S.W.2d 549, 560 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). The *Nenno* court concluded that in fields other than the hard sciences, such as the social sciences, factors like an expert's education, training, and experience are more appropriate factors in testing reliability than the scientific method. *Id*. at 561. Thus, when measuring the reliability of an expert's opinion in fields within the soft sciences, the *Nenno* court concluded that courts should consider whether: (1) the field of expertise is a legitimate one; (2) the subject matter of the expert's testimony is within the scope of that field; and (3) the expert's testimony properly relies upon the principles involved in that field of study. *Id*.

The supreme court has yet to adopt the *Nenno* approach, but several of our sister courts have concluded that the *Nenno* framework should be employed to evaluate soft science testimony in civil cases. *In re J.B.*, 93 S.W.3d 609, 629-31; *see also In re A.J.L.*, 136 S.W.3d 293, 298 (Tex. App.—Fort Worth 2004, no pet.) (applying *Nenno* framework in parental termination case); *In re G.B.*, No. 07-01-0210-CV, 2003 Tex. App. LEXIS 8737, at *2 (Tex. App.—Amarillo Oct. 10, 2003, no pet.) (same). With regard to evaluating matters within the psychological or sociological sciences in parental termination cases, we agree. A section 107.051 social study does not lend itself to evaluation by the *Robinson* factors because it is an inherently subjective endeavor and is not susceptible to scientific replication or statistical or rate of error analysis. As the El Paso court reasoned:

> Generally speaking, the purpose of a social study is to interview the litigants and those individuals with knowledge of relevant facts, such as extended family members, neighbors, scout leaders, teachers, baby sitters, day-care providers, doctors, sports coaches, and other individuals who have had the opportunity to observe the parenting abilities of the litigants, the relationship between the child and the parents,

13

the living arrangements at both households, and the plans each litigant has adopted for the day-to-day caretaking of the child. It is designed to be comparative in nature . . . . The Family Code does not detail the individuals to be interviewed nor the issues to be covered by the report for the simple reason that the relevant facts to be developed will largely depend on the disputed issues and the theory or theories which will be litigated. [Footnote omitted.] Further, because the trial court has great discretion in determining the overriding best interest of the child, the Legislature has deferred the development of appropriate standards and criteria to either the appropriate state agency or to the court itself.

*Chacon v. Chacon*, 978 S.W.2d 633, 637-38 (Tex. App.—El Paso 1998, no pet.). As a result, we will also analyze the admissibility of Payne's testimony under the *Nenno* approach.

Payne testified at length about her qualifications, training, and experience; she described her investigation, interviews, and conclusions in detail. Payne holds a bachelor's degree in sociology and psychology from the University of Texas at Austin. She has extensive work experience in the foster or substitute care industry. Payne works primarily for the Department but is also employed by a private agency to conduct social studies for various clients. She has received on-the-job training in conducting social studies and is certified by the Department to conduct the studies. She estimated that before this case she had conducted approximately 150 social studies.

In fulfillment of her duties, Payne visited and took photographs of Taylor's home. She interviewed Taylor and Taylor's boyfriend Gary Russell, as well as Taylor's employer, and family and church friends. She thoroughly investigated Taylor and Russell's backgrounds and explained her findings and conclusions in the report. As a result of her investigation, Payne determined that Taylor's home was inappropriate for D.A.C.

Taylor disagrees with Payne's conclusion but makes no specific criticism of Payne or the study. She does not explain how or in what manner Payne's qualifications are inadequate.

14

Although she claims that Payne's testimony is not scientifically reliable, we find that the trial court did not abuse its discretion under the *Nenno* standard. Considering Payne's education, training, and experience, and the fact that she explains her findings and conclusions in depth, we do not believe that the district court abused its discretion in holding that Payne was qualified to conduct the study and testify in support of her conclusions. Payne was certified by the Department to conduct these social studies and the governing statute expressly delegates the setting of standards for the studies to the Department. We overrule Taylor's first issue.

### Admission of Taylor's convictions

In her second issue, Taylor argues that the trial court erred in admitting evidence of a 1990 drug conviction. *See* Tex. R. Evid. 609. She also urges that the probative value of both her that conviction and a 1997 drug conviction were substantially outweighed by their unfairly prejudicial value and thus should have been excluded. *See* Tex. R. Evid. 403. In her third issue, Taylor argues that the trial court abused its discretion in permitting the Department to impeach her with inconsistent prior testimony in which she claimed incorrectly that she had successfully completed probation for her 1990 conviction. *See* Tex. R. Evid. 403, 609.[12] We disagree.

Over Taylor's objections, the trial court allowed the Department to cross-examine Taylor about her two drug convictions. Taylor admitted that in 1990 she was convicted of delivery of marihuana and received five years' probation. She acknowledged that she used marihuana

---

[12] At trial, Taylor also objected to this cross-examination on the basis that it was improper impeachment under rule 613. She does not assert this argument on appeal but instead relies only upon rules 403 and 609.

15

approximately once a week during that time period and that she failed two successive drug tests later in 1990, causing her probation to be revoked and her being sent to the state penitentiary for a year and a half. Taylor also admitted that, in 1997, she was convicted of marihuana possession and served 90 days in the McLennan County jail.

We review questions regarding the admission or exclusion of evidence for an abuse of discretion. *Malone*, 972 S.W.2d at 43. In addition to showing an abuse of discretion, an appellant must also show that the evidentiary ruling was calculated to cause and probably did cause the rendition of an improper judgment. Tex. R. App. P. 44.1; *Malone*, 972 S.W.2d at 43.

Taylor's reliance on rule of evidence 609 in this case is misplaced. Rule 609 provides, in relevant part:

(a) General Rule.

*For the purposes of attacking the credibility of a witness*, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.

(b) Time Limit.

Evidence of a conviction *under this rule* is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

Tex. R. Evid. 609 (Emphasis added.). As the italicized portions of the rule suggest, rule 609 is not a categorical limitation on the introduction of convictions for any purpose. Rather, it applies only

16

to convictions offered for purposes of impeachment. Here, the Department offered Taylor's convictions not solely to impeach her credibility but as relevant evidence going to the controlling issue in her case—the best interests of D.A.C.

We have already reviewed the *Holley* factors, used to evaluate the best interests of a child. *See Holley*, 544 S.W.2d at 372; *Leal v. Texas Dep't. of Protective & Regulatory Servs.*, 25 S.W.3d at 321. Taylor's use of and involvement with illegal drugs is highly relevant to several of these factors, as is the existence of her criminal convictions. *See in re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth, 2003, no pet.); *In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.), *disapproved on other grounds by C.H.*, 89 S.W.3d at 24-25; *see also In re C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex. App.—Waco 2000, pet. denied) (character evidence relevant to best-interest analysis).

Taylor must thus rely exclusively on her rule 403 objection if she is to demonstrate that the evidence was improperly admitted. We disagree with Taylor that the mere age of her drug convictions, or what she claims to be her reformed behavior in more recent times, renders her convictions unfairly prejudicial relative to their probative value. *See* Tex. R. Evid. 403. When the convictions are coupled with Taylor's history of illegal drug use—which, she admitted, spanned the 1980s until as recently as two years prior to trial—and her tolerance of such conduct by others around her, the trial court did not abuse its discretion in admitting them into evidence. *See In re M.G.D.*, 108 S.W.3d 508, 513-14 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (jury can accept or reject evidence of appellant's rehabilitation from drug use in determining termination issues). We overrule Taylor's second issue. Likewise, he hold that the trial court did not abuse its discretion in

permitting the Department to impeach Taylor with her inconsistent prior testimony claiming that she had successfully completed her 1990 probation. We overrule Taylor's third issue.[13]

### *Sufficiency of evidence for managing conservatorship*

In her fourth issue, Taylor challenges the factual and legal sufficiency of the jury's findings that denied her custody of D.A.C. and granted it to the Department. Actions to determine the conservatorship of a child, like parental termination, are governed by the best interest of the child. *See* Tex. Fam. Code Ann. § 103.002. A child's best interests are always the primary consideration for the court. *In re Rodriguez*, 940 S.W.2d 265, 271 (Tex. App.—San Antonio 1997, writ denied); *Neely v. Neely*, 698 S.W.2d 758, 759 (Tex. App.—Austin 1985, no writ). Because she is not a parent, the standard of proof on Taylor's claim was merely preponderance of the evidence, not clear and convincing evidence. *See* Tex. Fam. Code Ann. § 105.005 (West 2002); *Choyce v. Dallas County Child Welfare Unit*, 642 S.W.2d 559, 560-61 (Tex. App.—Dallas 1982, no writ) (explaining that, because conservatorship is revocable and less drastic adjudication than termination, stricter clear and convincing burden is not applicable). A jury's custody determination is binding on the trial court if supported by evidence. Tex. Fam. Code Ann. § 105.002(c), (d); *Rodriguez*, 940 S.W.2d at 271.

If a party is attacking the legal sufficiency of an adverse finding of an issue on which it did not have the burden of proof, the attacking party must demonstrate on appeal that there is no

---

[13] Even if Taylor had preserved her objection under rule 613, we believe that requiring Taylor to read her prior testimony line-by-line was harmless error in the face of other evidence regarding D.A.C.'s best interests.

evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 847 (Tex. App.—Austin 2003, no pet.). In reviewing a no-evidence issue, we are to consider only the evidence favoring the finding, disregarding all direct and circumstantial evidence to the contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13 (Tex. 2002); *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). A party attacking the factual sufficiency of an adverse finding on which the other party had the burden of proof must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ). We should set aside the verdict only if the evidence that supports the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We may not reverse merely because we conclude that the evidence preponderates toward a different answer. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

Taylor testified that she was forty-one years old and had been drug-free for two years. She had been in a committed relationship with Gary Russell for two years without any separations. Taylor lived with Russell in a home he owned. They were not married. Taylor described Russell's property as being located on a farm-to-market road and having a large yard. She planned for D.A.C. to have her own room and was going to put in a new bed, dresser, and closet. She also planned to purchase a window unit for the bedroom that would provide heat and cooling until they installed

19

central heat and air conditioning. Taylor also admitted that she and Russell smoke cigarettes but said that they would agree not to smoke in the house if they gained custody of D.A.C.

Russell's home was reported to be modest, comfortable, and clean. There were a few alterations needed, but Russell said he was making the changes. For instance, their heating system was a wood-burning stove, which Payne determined was inappropriate for an infant. Russell testified that he was installing a central heating system in the house. Also, the house needed to be finished out in several places with base boards and window frames.

Russell testified that he had known Taylor for five years and had been in a relationship with her for two and a half years. He described Taylor as a good housekeeper and homemaker. The couple made a modest but dependable income. Taylor worked two jobs, one as a cook at the Main Street Café three days a week from 8:00 a.m. to 3:00 p.m., and the second as assistant supervisor at the Mill Creek Country Club three days a week from 9:30 a.m. to 5:00 p.m. She had health insurance through Mill Creek. Russell was fifty-six years old and was retired after having been an auto mechanic and welder for thirty-five years. He had served two years in Vietnam, where he contracted spinal meningitis, which eventually left him 100 percent disabled.

Russell testified that he and Taylor would provide D.A.C. a good home and would protect her. He described Taylor's love and longing for D.A.C. by saying, "[s]he wants this baby real bad." He spoke of the disappointment Taylor felt about losing her first grandchild (the first child of Costine and Carpenter). He said that Taylor had bonded with D.A.C. and that D.A.C. recognized Taylor.

20

Russell also testified that it was apparent to him that the Department never seriously considered placing D.A.C. with them. He said Payne's social study was inaccurate and "misrepresented everything." Russell had no criminal history. He said that he had never known Taylor to use drugs, that he did not use drugs, and that he did not associate with people who did.

Several witnesses testified as to the good character of Taylor and her fitness as a parent. Taylor's supervisor at Mill Creek, Debra Pendergraph, had worked with Taylor for the past six years. She testified that Taylor was a good, dependable employee who loved her granddaughter and would provide her a good home.

Wanda Hibbler, a friend of Taylor and Russell who owned a child development center, testified that Taylor was a warm, loving person who had fought hard for custody of her grandchild. She said Russell was a good and loving father and had raised his own child as a single parent. She said that Russell was good about getting his son out of trouble. Hibbler testified that she and Taylor planned that, if Taylor obtained custody, Hibbler would babysit D.A.C. when Taylor was at work.

Russell's minister, Harold Goodwin, testified that he had known Russell for ten years and Taylor for two and that they would provide D.A.C. with a good home. He said Taylor clearly loved her granddaughter very much. He said that the couple had a good relationship, and he had never witnessed any fights between them. Goodwin's wife Patricia testified that she was a frequent visitor to the couple's home and that it was clean and comfortable. She said that Taylor loved D.A.C. "pretty deeply" and the couple would give the child a good home. She said that there was

nothing about Russell and Taylor that would concern her about their raising a baby. Another of the couple's friends, Rance Nash, gave similar testimony.

JoAnn Costine, Taylor's ex-mother-in-law, testified about how much Taylor loved D.A.C. and wanted to build a home for her. She said that Russell was a solid man who would be a good role model for the child. She said that Russell had been a good influence on Taylor and the couple had a great relationship. In her opinion, Taylor would do well raising a child.

The Department contrasted this favorable testimony with evidence of Taylor's history of drug use and drug-related crimes, previously discussed. In addition, the Department entered evidence concerning the years between Taylor's incarcerations. At that time, while her son Costine was between five and twelve years of age, the child was left with his father, a methamphetamine addict who was frequently in jail himself. At the time of trial, Costine's father was incarcerated. Taylor suggested that Costine's criminal conduct is attributable to his father, though the Department urged that Taylor also bore some responsibility. At the time of trial, Costine had just been released from prison for aggravated robbery and possession of methamphetamines and resided in a halfway house in Bryan. He was first sent to jail at age thirteen for possession of methamphetamines, receiving a fifteen-month sentence. Responding to the favorable testimony about Russell, the Department pointed out that Russell also had an adult son with a criminal record who, at time of trial, was living in a vehicle parked on Russell's property.

The Department also presented evidence that D.A.C. was doing well in foster care with Jose and Suzy Ramirez, had bonded with them, and considered them her parents. The Ramirezes both testified that they wanted to adopt D.A.C. The couple had been married thirty-two years and owned their own home. Mr. Ramirez said that their home had five bedrooms and two

22

bathrooms. He had been a surgical assistant at Darnell Hospital for nineteen years, and Mrs. Ramirez was a registered nurse at the same facility. Mr. Ramirez had two years of university education and one year of surgical assistant training. Mrs. Ramirez held a bachelor's degree in nursing. He said that he worked a consistent schedule from 7:00 a.m. to 3:00 p.m. and did not have to take calls at the hospital.

The Ramirezes had three children of their own, ages sixteen, seventeen, and nineteen. Their oldest son attended Central Texas College and worked at Home Depot. Their younger son and their daughter attended high school. Mr. Ramirez testified that none of their children had ever been in trouble or used drugs. Both testified that their children got along very well with D.A.C. and loved her. Mrs. Ramirez testified that they were teaching D.A.C. to speak both Spanish and English, but Spanish was the primary language spoken in the home. There was testimony that D.A.C. is one-quarter Hispanic.

Mr. Ramirez testified that his health was good but that he took medication for high blood pressure. Mrs. Ramirez said that she had just retired after having back surgery. She said she could no longer work because her job in the operating room required her to do heavy lifting. She said she was "on disability," and was restricted from lifting more than thirty pounds.

The couple said that they had been foster parents since 1997 and estimated that a total of thirty children had been placed in their home in that time. They had never adopted a foster child. D.A.C. was eighteen months old at the time of trial, and she had been in the Ramirez's home since she was a young infant. D.A.C. called Mrs. Ramirez "mama" and Mr. Ramirez "poppy"; she knew no one else as her parents. The Ramirezes both testified that they loved D.A.C. very much and that

23

she was already a part of their family. Mrs. Ramirez testified that they began wanting to adopt D.A.C. soon after she was placed in their home.

D.A.C.'s court-appointed guardian ad litem, Mike Lockett, testified that, in his opinion, D.A.C.'s interests would best be served by appointing the Department as her managing conservator. Lockett testified that his job was to look after the interests of children in the foster care system in Bell County. He monitored the children in foster care and made recommendations to the court and jury. He had a bachelor's degree in psychology, a master's degree in counseling, and extensive experience working with children, including as a caseworker.

Lockett testified that D.A.C. was doing well in foster care. He said that he had known the Ramirez family for years because he placed foster children with them when he was a caseworker. He said they had taken "really good care of every child that I was responsible for that was placed in their home." He said he thought very highly of them as foster parents and that he was responsible for having D.A.C. placed in the Ramirez home. Lockett said that there is no risk to D.A.C. with the Ramirezes but some risk in granting conservatorship to Taylor.

Although he attempted to make a home visit to Taylor's home, he was not able to find it because he had the wrong address. He had not interviewed Taylor. He also said that "there's a part of me that would like to see Ms. Taylor continue on in [D.A.C.'s] life, not as the person who raises her, but as her grandmother." He said it would be beneficial for D.A.C. for the grandmother to remain involved in her life. However, he did not think that Taylor should have primary custody of D.A.C.

When we consider all the evidence in a light most favorable to the jury's decision, as we must, *see Lenz*, 79 S.W.3d at 13, we find the evidence legally sufficient to support denying

24

Taylor conservatorship. In addition, in light of the whole record, the evidence is not so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d at 176. Taylor offered much evidence to support her ability to parent D.A.C. However, the Department emphasized her drug history, her previous criminal convictions, and other problems with her family situation. In addition, Locket testified there was some risk in granting Taylor conservatorship while there was none if conservatorship was granted to the Ramirezes. We acknowledge Lockett's conclusion that it would be beneficial for Taylor to remain a part of D.A.C.'s life as her grandmother. However, any such desire does not authorize us to second-guess the jury's resolution of the evidence. We find the evidence factually sufficient to support the jury's conclusion. We overrule Taylor's fourth issue.

## CONCLUSION

We have overruled all issues brought on appeal by Carpenter, Costine, and Taylor, and we affirm the decree of termination of the district court. The motion to withdraw filed by Lori Carpenter's counsel is granted.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: March 10, 2005

25