# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00286-CV

---

**T. W. S., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-006691, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant T.W.S. (Father) appeals from the district court's decree, following a bench trial, terminating his parental rights to his daughter, T.R.S. (Tiffany), who was born on August 16, 2022.[1] Father's court-appointed counsel has filed an *Anders* brief concluding that the appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). Counsel has certified to this Court that he has provided Father with a copy of the *Anders* brief

---

[1] For the child's privacy, we refer to her using a pseudonym and to her parents and other relatives by their familial relationships to each other. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

and informed him of his right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. This case began in August 2022, when the Department received a report that upon Tiffany's birth, her mother K.T. (Mother) tested positive for marijuana and amphetamines and admitted to using methamphetamine three weeks before Tiffany's birth. According to the Department's removal affidavit, a copy of which was admitted into evidence during trial, Mother "admitted to a long history of habitual methamphetamine use as well as marijuana use." Father "also has a history of drug use and has refused to complete drug screens." Moreover, Father "maintains a relationship with [Mother], and there are concerns that he could be with her when she has used and has used with her. While he is aware of her drug use, his plan is to allow her to be [Tiffany's] primary caregiver." Based on this and other information, the Department filed a petition seeking to terminate Mother's and Father's parental rights to Tiffany and sought emergency removal of Tiffany. The district court removed Tiffany from Mother's and Father's care and ordered them to complete services to obtain her return.

The case proceeded to a bench trial. Neither Mother nor Father appeared at trial, although their attorneys were present. Four witnesses testified: Department investigator Evonne Rodriguez; Family Elder Care case manager Sierra De La Fuente, who provided housing services to Mother; Department caseworker Shekelia Harris; and CASA volunteer Michelle Murphy, who served as the guardian ad litem for Tiffany during the case.

Department investigator Rodriguez testified that she interviewed Mother at the hospital after Tiffany was born. Mother admitted to Rodriguez that she used methamphetamine

2

while pregnant with Tiffany and that Father was aware of her drug usage but "didn't agree with it," going so far as to throw away her drugs when he found them. Rodriguez testified that both parents were ordered to drug test during the case and that the Department tried to facilitate that testing. However, neither parent engaged in drug testing, even though Rodriguez "set it up for them." She even "offered them rides" to the testing site but "received no responses from either parent." Rodriguez testified that one of the Department's "main concerns" with Father during the investigation was that he "had an extensive record for substances; manufacturing and delivering and possession. [Father] also didn't have a current job."

Additionally, the Department was concerned that Father planned to leave Tiffany in Mother's care while he attempted to find a job and after he found a job, despite knowing that Mother had drug issues. Father told Rodriguez that his plan was for Tiffany "to reside with him in his apartment at his home," for Mother to "come to the home to visit with them," and for Mother to "come to the home and provide the care for her while he was away at work." This plan concerned the Department because Tiffany "was born with substances in her system already," and the hospital where Tiffany was born had indicated that she "would need further care [and] further evaluation." Rodriguez also testified that after she interviewed Father, he had sent Rodriguez sexually explicit photos of Mother "advertising herself" on pornographic websites and a video of Mother using methamphetamine "as evidence that [Mother] was not fit to be a parent." According to Rodriguez, Father later denied sending the photos and video and claimed that they were sent by somebody else.

Family Elder Care case manager De La Fuente testified that she worked with Mother both before and during the Department's case to provide her with financial assistance. Although Mother was De La Fuente's "primary client," she also worked with Father upon

3

Mother's request. De La Fuente testified that when Father contacted her, he would send her messages that Mother "was high and using," send her pictures of Mother "smoking out of a pipe," send her screenshots of Mother "on a porn site," and "demanded that [De La Fuente] exit [Mother] from services as that was something that she was doing." Father told De La Fuente that he was with Mother when he took the photos of her using drugs.

Department caseworker Harris testified that she was assigned the case in April 2023 and that she had tried to meet with the parents in person every month. She had met with them after some parent-child visits, had emailed and texted Father, and had offered to meet him at his residence, "which he did not let me" do. Harris "requested [home] access from [Father] three times, and he denied all three times." Harris also testified that the parents were offered visits twice a week with Tiffany but only participated in 17 visits over the course of 18 months, with the last visit being on Tiffany's birthday in August 2023, approximately six months before trial. Father had stopped responding to Harris altogether between August 2023 and January 2024, when Father "reached out and said he wanted to resume the visits" with Tiffany. However, when Harris arranged a visit at that time, Father "didn't show up." On cross-examination, Harris acknowledged that the visits that Father had attended went well and that he appeared to be bonding with Tiffany during the visits.

Harris explained that the Department's primary concern with Father "was with his sobriety and [his] inability to prove that he was sober and based on his previous criminal history." Father's court-ordered services included drug testing, a psychological evaluation, individual therapy, NA or AA meetings, and parenting classes. Harris testified that Father never complied with any of his court-ordered services in the case, including those regarding drug testing and psychological testing. At the time of trial, the Department continued to have

4

concerns about the parents' ability to provide for Tiffany's safety, based on neither of them proving their sobriety and their refusal to allow the Department to visit their home. Harris did not believe that Mother or Father would be able to care for Tiffany at this time.

Harris further testified that since the beginning of the case, Tiffany had been placed in a foster home with D.O. (Foster Mother). Harris had personally observed Tiffany in that home and testified that Tiffany was "doing great" there. Harris explained, "She's walking now. She's enjoying her trampoline, and she enjoys books and being read to. And she's bonded with" Foster Mother and Foster Mother's daughter. Harris testified that Foster Mother was active in meeting Tiffany's needs and that Tiffany had no significant behavioral, medical, or therapeutic issues. The Department's plan was for Foster Mother to adopt Tiffany. Foster Mother's home study had already been approved, and she was a licensed foster placement. Harris added that Foster Mother was in contact with Paternal Grandmother, who had adopted Tiffany's older sibling, and that Foster Mother planned to maintain Tiffany's contact with that sibling.

CASA volunteer Murphy testified that Tiffany was an "active" and "really curious" child who loves books and who is "developmentally on target and thriving, doing really well at preschool." Murphy had visited Tiffany in the foster placement at least once per month throughout the case and believed that Foster Mother was able to meet Tiffany's emotional and physical needs. She agreed with the Department's current plan for Tiffany that she be adopted by Foster Mother. Murphy testified that Foster Mother "has provided her with a stable and safe, you know, home environment. She's provided her with stimulation and comfort and love . . . throughout her life really. [Tiffany] is clearly happy and feels loved and is connected with [Foster Mother] and her daughter."

Murphy had observed three visits between Mother and Father and Tiffany, and the parents "were engaged and met her needs" during those visits, but Murphy was unaware of any other efforts by Mother and Father to meet Tiffany's needs during the case. CASA did not "have any evidence for housing stability or sobriety" of the parents, and their visits with Tiffany had been "very sporadic" since August 2023. For these reasons, CASA believed that termination of Mother's and Father's parental rights was in Tiffany's best interest.

At the conclusion of trial, the district court found by clear and convincing evidence that Mother and Father had (1) constructively abandoned the child; and (2) failed to comply with the provisions of a court order that specifically established the actions necessary for Mother and Father to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O). The district court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the child's best interest. *See id.* § 161.001(b)(2). In accordance with these findings, the district court terminated Mother's and Father's parental rights to Tiffany. This appeal by Father followed.

After reviewing the entire record and the *Anders* brief submitted on Father's behalf, we have found nothing in the record that might arguably support an appeal. We agree with counsel that the appeal is frivolous.

We affirm the termination decree.

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Kelly

Affirmed

Filed: July 31, 2024