# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00332-CV

---

**K. W., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-22-009062, THE HONORABLE LAURIE EISERLOH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant K.W. (Mother) appeals from the district court's decree, following a bench trial, terminating her parental rights to her daughter, N.W. (Naomi), who was approximately eighteen months old at the time of trial.[1]  Mother's court-appointed counsel has filed an *Anders* brief concluding that the appeal is frivolous and without merit.  *See Anders v. California*, 386 U.S. 738, 744 (1967); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights).  The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal.  *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied).

---

[1]  For the child's privacy, we refer to her using a pseudonym and to her parents and other relatives by their familial relationships to each other.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Counsel has certified to this Court that she has provided Mother with a copy of the *Anders* brief and informed her of her right to examine the appellate record and to file a pro se brief. No pro se brief has been filed. Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647.

The district court heard evidence that the case began in October 2022, when the Texas Department of Family and Protective Services (the Department) received a referral alleging neglectful supervision of Naomi by Mother, who had just given birth to Naomi at home without the assistance of a midwife or any medical personnel. Department supervisor Pamela Forte testified that the Department was concerned that Mother "may not have received prenatal care because she had fear for the Department becoming involved." At the time Naomi was born, Mother had an ongoing CPS case involving her three other children, a twelve-year-old daughter (Kristy) and two twins born in 2021. Mother had a history of cocaine and methamphetamine use, and the twins had tested positive for methamphetamine at birth. The Department suspected that Mother gave birth at home without medical assistance because she was continuing to use illegal substances and did not want the Department to learn about that. The ongoing CPS case also involved allegations of domestic violence between Mother and Naomi's father (Father). The Department had concerns that Mother was allowing Father to reside with her, contrary to the terms of an emergency protective order that had been entered against him.

In November 2022, Kristy was found alone at a gas station by a police officer after Mother "had allegedly kicked her out of the home." Kristy reported that she had "witness[ed] a physical altercation" between Mother and Father "while the other children were

2

asleep." Kristy also reported that Father had "moved back into the home, and that he would leave the home if they were aware of when the Department would come."

After that, the Department filed its original petition seeking termination of Mother's and Father's parental rights to Naomi and was granted temporary managing conservatorship of the infant. However, the Department had difficulty locating Naomi, who was not in Mother's care at the time, and eventually found her at the home of Mother's friend on January 3, 2023, approximately one month after the court had granted the Department temporary managing conservatorship and approximately two weeks after the court had ordered Mother to produce the child.

The district court ordered Mother to complete a family service plan to obtain Naomi's return. A copy of the service plan was admitted into evidence. Services included a psychological evaluation, random drug testing, a substance-abuse evaluation if Mother tested positive for drugs, and individual therapy. Mother also was ordered to obtain and maintain employment, obtain and maintain a safe and appropriate home, and follow all of her psychological / psychiatric recommendations.

Department caseworker Ariel Pierce testified that during her time on the case, between January 2023 and March 2024, approximately one month before trial, Mother did not submit to any drug testing, and the Department had ongoing concerns regarding Mother's substance use. Pierce testified that the Department also had concerns regarding Mother's mental health, specifically "homicidal and suicidal ideations," and additional concerns regarding domestic violence between Mother and Father. Pierce further testified that Mother had not been consistent visiting Naomi, attending either 23 or 24 out of the approximately 60 visits that the Department had scheduled, and that Mother had been unable to obtain employment or secure

3

stable housing during the case. Pierce believed that Mother's parental rights should be terminated because Naomi needed a safe and stable environment that Mother could not provide.

Doctor Keeley Crowfoot, who conducted a psychological evaluation on Mother, testified that Mother had thoughts of both "active homicidal ideation," which meant that Mother "had a list of people that she would like to harm or kill," and "passive suicidal ideation," which meant that Mother felt she "would be okay if [she] didn't wake up" but that she did not "necessarily have any active plans" to harm or kill herself at that time. Crowfoot added that Mother had reported a history of suicide attempts. Crowfoot diagnosed Mother with post-traumatic stress disorder and recommended that she see an individual therapist, among other recommendations. A copy of the psychological evaluation was admitted into evidence.

Mother's therapist testified that although Mother had consistently attended weekly therapy sessions in 2022, she had not been consistent after that, and their last therapy session was in December 2023, approximately five months before trial. The therapist did not believe that Mother had established herself as a safe and appropriate caregiver for Naomi.

Throughout the case, Naomi had been placed with her maternal great aunt (Aunt), who testified that she wanted to adopt Naomi. She explained, "My goal is to keep her with me. It's where she's always been. I think she feels safe, so my goal is to keep her with me." Pierce testified that Naomi has "done great" in Aunt's care, "hit[ting] all of her milestones," walking, and "saying some words." Pierce added, "She seems really happy; she's always smiling and running around. And the bond between her and [Aunt] seems really strong." Pierce had no concerns for Aunt as a caregiver.

Maggie Mann, the CASA volunteer, testified that Naomi was "doing fantastic" in Aunt's care and was bonded to her. CASA had ongoing concerns for Mother's substance use, as

4

she had "refused to test many times," and for her mental health, specifically Mother's "passive suicidal ideation" and her failure to follow any of the recommendations of the psychological evaluations. CASA also remained concerned with the stability of Mother as a placement, as she had no housing at the time of trial and no employment throughout the case. Mann opined that "the best thing for [Naomi] would be to be adopted by" Aunt, "the woman that she's been living with for her entire life and who she sees as her parent."

Mother, although represented by counsel, did not appear for trial. Aunt testified that she did not know Mother's whereabouts. Department caseworker Deanna Davis, who took over the case from Pierce in the last month before trial, testified that she had emailed and texted Mother during that time but "got no response at all."

At the conclusion of trial, the district court found by clear and convincing evidence that Mother and Father had (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (3) constructively abandoned the child; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for Mother and Father to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O). The district court further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the child's best interest. *See id*. § 161.001(b)(2). In accordance with those findings, the district court terminated Mother's and Father's parental rights to Naomi. This appeal by Mother followed.

5

After reviewing the entire record and the *Anders* brief submitted on Mother's behalf, we have found nothing in the record that might arguably support an appeal. We agree with counsel that the appeal is frivolous.

We affirm the termination decree.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   August 30, 2024