# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-05-00656-CV

Frances Boyd, Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT
NO. 2003-0606, HONORABLE RONALD G. CARR, JUDGE PRESIDING

M E M O R A N D U M   O P I N I O N

Following a jury trial, the trial court signed an order terminating the parental rights of appellant Frances Boyd to her son, C.B. Boyd appeals, complaining that the trial court erred in overruling her motion to transfer venue and admitting evidence that Boyd had been investigated earlier by the Department. We affirm the order of termination.

## Background

Boyd does not contest the sufficiency of the evidence supporting the jury's verdict. Therefore, only a brief recitation of the facts is necessary. C.B. was born in June 1999, and was removed from Boyd's custody by the Department in April 2003, when he was almost four years old. John Matthew Boyd is the child's father, and at the time of trial, had relinquished his parental rights to C.B. The Department had been involved with Boyd and her children since 1993, receiving approximately eight referrals between April 1993 and April 2002 alleging neglectful supervision,

emotional and physical abuse, and physical neglect.[1]  In July 1998, Adult Protective Services received a referral alleging that Boyd was exploiting and physically neglecting her mother; only the exploitation allegation was validated.

The Department took custody of C.B. in April 2003 after receiving a referral alleging physical abuse, neglectful supervision, and physical neglect of C.B.  The referral came from a community shelter in New Braunfels, where Boyd had gone seeking assistance. The referral stated that Boyd appeared "manic and delusional," and that C.B. was unkempt, constantly crying, and appeared to be developmentally delayed.  When the Department arrived to investigate, Boyd was angry and unfocused.  She denied having a mental illness and said she avoided going out in public because she feared someone would make a report against her.  She thought this referral had been made because she is Christian and "had been 'praying a lot lately.'"  When the caseworker attempted to discuss the shelter's allegations, Boyd said she and C.B. were leaving and began to walk away. Law enforcement had to escort her back to the Department caseworker, and Boyd became irate and disoriented and eventually had to be restrained by the police officers.

The Department prepared a service plan requiring Boyd to participate in parenting classes, individual therapy, and anger management classes, undergo a drug and alcohol assessment, obtain and provide proof of stable employment and suitable housing, allow the Department to make home visits, and keep the Department informed of her address and phone number.  Boyd completed the parenting classes, psychological evaluations, and drug and alcohol assessment, but she did not complete individual therapy or anger management or maintain or provide proof of employment or

---

[1]  Boyd has four older daughters who live with their father and were not part of this case.

housing. Witnesses testified that C.B. did not appear to have bonded with Boyd, and C.B.'s therapist testified that C.B. had improved in foster care, but that he probably would need additional therapy. He believed C.B. had improved because of the stability of his foster placement but would regress if returned to an unstable environment with Boyd. C.B.'s therapist, caseworker, and guardian ad litem all testified that C.B. was doing well in foster care and that being returned to Boyd's care would be detrimental to the child. The jury returned a verdict finding that Boyd's parental rights should be terminated, and the trial court signed an order of termination. It is from this order that Boyd appeals, complaining that the trial court should have transferred the case to Taylor County and that the court committed reversible error by admitting hearsay into evidence.

### Motion to Transfer

In her first point of error, Boyd argues that the trial court erred in refusing to transfer this case from Hays County, where the Department filed its petition, to Taylor County. She argues that because she filed a proper motion asserting continuing jurisdiction in Taylor County and no controverting affidavits were filed, the transfer was mandatory. We disagree.

The Department filed its petition in Hays County on April 23, 2003, alleging that it believed no other court had continuing, exclusive jurisdiction over C.B. The petition alleged that Boyd had a New Braunfels address, but the accompanying affidavit, sworn to by caseworker Tara Hopkins and describing the facts that led the Department to believe that removal was in C.B.'s best interest, gave a San Marcos address. According to the affidavit, Boyd told someone at the shelter that she and C.B. were living out of Boyd's car. When interviewed by the Department, however, Boyd said she was not homeless. She made inconsistent statements about her residence, saying that

3

she lived in Abilene and was going back; that her mother was sick in Abilene and Boyd was going there to help care for her; that Boyd was going to New Braunfels to stay with friends; and that she was going to stay in San Marcos, where a legal advocate was going to help her regain custody of her eleven-year-old daughter.

On May 9, a show-cause hearing was held. Boyd appeared in person and was not represented by counsel. It was discussed that Boyd had not yet been served with the Department's petition. The Department explained that it attempted service first at the New Braunfels address Boyd had provided but was unsuccessful because she had moved. When Boyd informed the Department that she had an Abilene address, the Department filed an amended petition requesting service in Abilene, but Boyd then called to say she had moved to Cedar Park. There was a discussion at the hearing that a constable was supposed to be serving Boyd with citation that day. The trial court explained to Boyd that she could continue with the hearing, in which case the court would enter temporary orders, or that the hearing could be reset for two weeks "to give you time to be served and prepare for a hearing and hire a lawyer" or have one appointed. Boyd said she wanted to go forward with the hearing, explaining that she had already tried unsuccessfully to get an attorney through a legal aid office. The record does not reflect when, if ever, Boyd was finally served with citation; she asserts that her attorney was appointed on May 21, and the Department does not contest that date.

On June 12, 2003, Boyd's appointed attorney filed a motion to transfer, stating that Taylor County had continuing, exclusive jurisdiction over C.B. "as a result of prior proceedings" and that the cause should be transferred there. The next day, a status hearing was held before an associate judge, and Boyd sought a ruling on her motion to transfer. The Department asserted that

jurisdiction should remain in Hays County, and the child's attorney ad litem objected to the transfer, stating that it was not in C.B.'s best interest. Later in the hearing, the trial court stated that there was continuing jurisdiction in Taylor County, but that it would carry the motion to transfer forward, saying, "I think where the case ends up depends on how things develop in the case." At that point, the attorney ad litem said, "I would like to make a formal objection to any discussion or proceedings on the motion," asserting that "all we've had is an oral motion, which is not contemplated under 155.204." The court informed the attorney ad litem that a written motion had been filed, and although the motion stated that it had been served on all parties, the ad litem said he had not been served with and was unaware of the written motion. The ad litem said, "We had no opportunity to write a controverting affidavit. And without specific knowledge right now of when the petition was filed, it may very well not even be timely filed by the 12th. And if so, I lodge that objection." The court said it would revisit the issue in September.

Boyd immediately filed an appeal of the associate judge's denial of the transfer, seeking review by the trial court. C.B.'s attorney ad litem filed an objection, stating that Boyd had not served him with the motion and arguing that due to the lack of service and notice, there was no valid motion for the associate judge to consider and, therefore, no valid ruling for Boyd to appeal. The ad litem also argued that the motion was untimely because it was filed more than twenty days after the petition was filed, that no notice was provided that the motion would be heard, and that the child and his attorney ad litem were not given sufficient time to file a controverting affidavit.

No hearing was held on Boyd's appeal, and the motion to transfer was not raised again until a February 2004 hearing on Boyd's attorney's motion to withdraw, when the issue of a

5

transfer was briefly mentioned. At that hearing, John Boyd was asked if he intended to hire an attorney. Rather than answering the question, Mr. Boyd stated that he wanted to file a motion to transfer, and the trial court said, "That's not the question. The question to you, sir, do you intend to hire a lawyer?" Mr. Boyd explained that he and Boyd had reconciled after a separation and that he intended to hire an attorney to represent both of them. Later in that hearing, Boyd mentioned the transfer issue, but the trial court stopped her, returning to the issue of whether the Boyds were going to hire an attorney or needed appointed counsel. The court gave the Boyds forty-five days to hire an attorney; when neither party hired a lawyer, a new attorney was appointed to represent Boyd.

On June 12, 2004, one year after Boyd's motion to transfer was filed, Boyd's attorney filed a "motion to enter order," stating that the June 2003 motion to transfer was timely filed because Boyd was never served with citation. The motion also asserted that because no controverting affidavits had been filed, transfer was mandatory under section 155.204 of the family code. The motion recited that the motion was served on the Department and C.B.'s attorney ad litem, but did not state the date on which the motion was mailed. A hearing on the motion was set for July 22, 2004. In that very brief hearing, Boyd's attorney introduced himself and stated, "We filed a Motion to Enter Order, and we have argued the Motion to Transfer should be granted and order be entered. The Court has ruled that the Motion to Enter Order is denied and a subsequent motion will be presented to the Court for its approval. And that's all I have." The attorney ad litem stated that "in regards to [Boyd's attorney's] argument, in fact, the Attorney Ad Litem was never served with any copy of a Motion to Transfer Venue."

6

On appeal, Boyd argues that because no opposing affidavits were filed by C.B.'s attorney ad litem or the Department, the transfer to Taylor County was mandatory. She argues that the motion to transfer was timely because the record does not show that she was served with the Department's citation and petition. Boyd acknowledges that her participation in the May 9 hearing could constitute notice, but argues that because of the magnitude of the constitutional rights involved, we should consider her motion timely, counting its due date from the date she was appointed counsel, May 21. Boyd further argues that the motion's certificate of service "creat[ed] a presumption of proper service" and that the attorney ad litem's objection to her appeal from the associate judge's denial of the transfer "conceded actual notice." Boyd further notes that although the attorney ad litem objected to a lack of notice, the Department never raised such complaints.

Section 155.204 of the family code provides that if a motion to transfer is timely filed and no controverting affidavits are timely filed in response, the trial court shall transfer the case without a hearing. Tex. Fam. Code Ann. § 155.204(c) (West Supp. 2006). A motion to transfer is timely if filed (1) on or before the first Monday following the twentieth day after service of citation or notice of the suit or (2) before the hearing commences, whichever is sooner. *Id*. § 155.204(b). A controverting affidavit must be filed on or before the first Monday following the twentieth day after "the date of notice of a motion to transfer is served." *Id*. § 155.204(d).

We recognize the weight of constitutional rights involved in this case. However, the statute is clear that to invoke mandatory transfer provisions, a motion to transfer must be filed on the first Monday following twenty days from service of citation *or notice of the suit*. *Id*. § 155.204(b). There is no doubt that Boyd had notice of the suit on May 9, when she appeared and participated in

the hearing. Thus, the motion to transfer was due by June 2, 2003. *See id*. Because Boyd's motion was filed ten days late, it only raised the issue of a discretionary transfer, not a mandatory transfer. *See Bollard v. Berchelmann*, 921 S.W.2d 861, 864-65 (Tex. App.—San Antonio 1996, orig. proceeding); *Garza v. Texas Dep't of Human Servs.*, 757 S.W.2d 44, 47-48 (Tex. App.—San Antonio 1988, writ denied); *see also* Tex. Fam. Code Ann. § 155.202 (West 2002) (governing discretionary transfers).

Boyd does not argue that the trial court would have abused its discretion in denying her motion to transfer if the motion sought a discretionary transfer; she only asserts that the transfer was mandatory under section 155.204. The Department asserts that the trial court did not err in refusing to exercise its discretion to transfer the case. We agree.

The records from the pretrial hearings contain little information about why Taylor County would have jurisdiction over this matter.[2] At the show-cause hearing held in May 2003, Boyd testified that she had family in Abilene and was living there. Boyd mentioned filing for divorce in Taylor County, but then said "it hasn't been final. I have to reapply, in other words." The

---

[2] Evidence from the trial on the merits showed that C.B.'s paternity was established in a January 2000 order out of the 326th District Court of Taylor County, which found that John Boyd was the child's father. The Boyds were married in May 2000. Generally, once a court acquires continuing, exclusive jurisdiction over a child by issuing a final order, *see* Tex. Fam. Code Ann. § 155.001(a) (West 2002), that court may continue to exercise jurisdiction over matters related to the child. *Id*. § 155.003(a) (West 2002). However, a court loses continuing, exclusive jurisdiction if the parents remarry after a divorce but then file a new suit for divorce and child custody in a different court. *Id*. § 155.004(a)(2) (West 2002). This case presents a more unusual situation in which the parents were not married before the paternity proceeding took place but married afterwards. It is arguable that Taylor County's continuing, exclusive jurisdiction arising out of its issuance of the paternity order was extinguished when the Boyds married. *See id*.; *id*. § 154.006(b) (West Supp. 2006) (providing that court orders related to child support, conservatorship, possession, or access generally terminate if obligor and obligee marry).

8

Department stated that it had attempted to serve Boyd with citation at the New Braunfels address she first provided, then at the Abilene address she gave, and that she most recently told the Department she was living in Cedar Park. A Department caseworker testified that one of Boyd's daughters told the Department that Boyd was homeless and "moving around constantly." An employee for the shelter from which C.B. was removed, which is located in San Marcos, testified that Boyd said she and C.B. were homeless and living out of her car. She also testified that Boyd had sought services from the San Marcos shelter six times in the past year and had gone to the affiliated Salvation Army facility "several times." The associate judge placed C.B. with his half-sisters and Boyd's ex-husband, who live in Hays County.

At the time of the June 2003 hearing, Boyd was living in Cedar Park and had a job there as a caregiver for a health-care provider. She testified that before C.B.'s removal, she had been in San Marcos "a couple of times" and had stayed at the shelter from which C.B. was removed once in the past, before the incident that led to his removal. However, she also testified that she had an apartment and was a substitute teacher in Abilene.[3] Boyd testified that at the time of C.B.'s removal, she was not living in her car, was in New Braunfels to visit her daughters, and was considering giving up her apartment in Abilene. She testified that John Boyd was incarcerated in Abilene but had previously lived and worked in New Braunfels. When asked where she thought C.B. would be best placed during the pendency of the proceeding, she said that her first preference would be for him to be placed with her and her next choice would be with a cousin who lives in San Antonio; the trial

---

[3] A witness testified during the trial itself that she contacted Boyd's apartment manager in Abilene and was told that Boyd had been evicted and did not have a house in Abilene.

9

court continued C.B.'s placement with his half-sisters and Boyd's ex-husband. The court observed that if it transferred the case, Boyd would have to start all over in Abilene, whereas she had obtained a place to live and a good job in the Hays County area. The court also noted that Boyd had begun to make progress in Hays County, had an excellent attorney in Hays County, and had evaluations and services set up in Hays County.

Boyd's motion to transfer was not timely filed under section 155.204 of the family code so as to call for a mandatory transfer. Based on this record, we cannot hold that the trial court abused its discretion in refusing to transfer the case. We overrule Boyd's first point of error.

### Admission of Evidence

In her second point of error, Boyd argues that the trial court erred in admitting evidence of earlier Department investigations because the Department's reports contained inadmissible hearsay in the form of allegations by people who were not Department employees.

We review a trial court's decisions related to the admission or exclusion of evidence for an abuse of discretion. *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 652 (Tex. App.—Austin 2005, pet. denied). Hearsay evidence is inadmissible unless it falls within an exception provided by the rules or a statute. Tex. R. Evid. 802. However, a party waives any complaint related to the admission of hearsay if she does not object. *See id*. A party who preserves a complaint related to the admission of hearsay must show on appeal that the erroneous admission "probably caused the rendition of an improper judgment." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *see* Tex. R. App. P. 44.1(a)(1).

10

The Department called Tara Hopkins, a Department investigator, to testify about her investigation into the referral the Department received in April 2003. Hopkins described the process of receiving and investigating a referral, explaining that after receiving the referral, she looked up Boyd's history with the Department and with Adult Protective Services. Hopkins was asked, "And when you went out to report [sic] this specific referral, what kind of information had you received?" Boyd objected, asserting, "[T]hat calls for hearsay if she's going to testify as to what the information is." The Department countered that the testimony was admissible under the hearsay exception set out in rule 803(8)(b) as a matter observed and reported "pursuant to a duty imposed by law" and that the report was a "record, report, statement, or data" compiled by a public agency. The trial court overruled Boyd's objection, and the Department asked, "What kind of report did you receive?" Hopkins answered that the Department received a referral stating that Boyd and C.B. were staying at the community shelter and alleging abuse, neglectful supervision, and physical neglect. She was then asked, "What kind of report did you receive, and what was the basis of that report?" Boyd objected "to any testimony about any kind of hearsay or about mental health," and the trial court sustained Boyd's objection "to the extent of hearsay."

The Department moved on to ask Hopkins "[w]hat other concerns were there," and Hopkins, reading from the April 2003 referral, answered that there were concerns that Boyd and C.B. were living in a car and had only eaten bread for two days or two weeks; that Boyd yelled at C.B. "all the time" and had dragged him on the floor and knocked him down; that C.B. had an unexplained eye injury; that Boyd became defensive "when her parenting skills [were] questioned"; that C.B. was unkempt, developmentally delayed, and largely unsupervised by Boyd; and that C.B.

11

was "constantly crying and having fits." Later, Hopkins testified without objection that Boyd had an "extensive history" with the Department. Hopkins also testified without objection about Boyd's history with the Department, such as when the Department received referrals, what children were involved, how many referrals were received, the basis for some of the referrals, and about the referral related to Boyd's mother. On cross-examination, Hopkins was asked whether she had personal knowledge about the veracity of the people making the earlier referrals, and she said she did not. She also testified that she did not have personal knowledge or proof beyond the Department's computer records of what services were provided to or what requirements were placed on Boyd in the past. On redirect, Hopkins was asked without objection what "other issues" arose during her investigation, and she explained that she "learned that on two separate occasions [C.B.] was left unsupervised in a hot car for lengths of time."

The next witness called was Leslie Ontiveros, a supervisor with the Department who, along with Hopkins, interviewed Boyd about the 2003 referral. When the Department asked what information was provided in the referral, Boyd objected, "I'm going to object to hearsay, if she's going to respond based on what someone has told her," and the Department responded that "under 803(8)(b) this is certainly a matter of—this is a matter that is observed pursuant to a duty to report, and it is therefore an exception to the hearsay rule." The trial court overruled Boyd's objection, and Ontiveros testified that the report alleged that Boyd was "constantly yelling and spanking" C.B., had dragged him on the floor and knocked him down, and was unable to explain an injury under his eye. Ontiveros further stated that the referral alleged that Boyd and her son were living out of their car, that C.B. was developmentally delayed and was allowed to run around unsupervised, and that Boyd

12

said she and C.B. had only had bread for the last two weeks. Ontiveros testified that when she received the referral, she reviewed Boyd's history with the Department and then went with Hopkins to investigate. After describing her interview with Boyd, Ontiveros was asked without objection whether she "had a referral from—there was a prior referral in April of 2002 concerning Ms. Boyd out of Abilene"; Ontiveros said that was correct. The Department then asked whether the earlier referral "was alleging basically the same type things," and Ontiveros answered, "Yes, that's correct." When the Department asked "what kind of things were alleged in that specific referral," Boyd objected that it was cumulative and had already been testified to, and the trial court sustained the objection. On cross-examination, Boyd asked Ontiveros a series of questions about whether Ontiveros spoke to any of the people who gathered information related to the earlier referrals or whether she had personal knowledge about the allegations made in the earlier referrals. On redirect, Ontiveros testified without objection that she asked Boyd about earlier referrals and her "extensive history" with the Department but that Boyd refused to discuss those matters.

On appeal, Boyd complains that the trial court erred in allowing Hopkins to "describe previous reports" made to the Department about Boyd, asserting that she raised a hearsay objection but was overruled. However, the testimony to which Boyd directs us and the objections she raised were related to questions about the April 2003 referral that led to C.B.'s removal, not to questions related to older referrals. When Hopkins testified about Boyd's history with the Department, Boyd did not raise hearsay objections—she raised that objection only twice, in reference to questions asked of Hopkins and Ontiveros about the allegations made in the *April 2003 referral*. Thus, Boyd has not preserved her complaint on appeal. *See* Tex. R. Evid. 802.

13

Furthermore, Boyd does not complain on appeal about Ontiveros's testimony, and at trial, she objected only to Hopkins's and Ontiveros's testimony about the April 2003 allegations, which were also testified to by Valerie Schultz, the director of social services at the community shelter who made the report to the Department. Schultz testified in detail about the basis of her report and about her observations of Boyd's and C.B.'s behavior on the day she made the referral. Because Schultz's testimony provided the same or similar evidence as the objected-to testimony and because Boyd does not assert on appeal that Ontiveros's testimony was erroneously admitted, any error in the admission of Hopkins's testimony is waived. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004). Finally, even if we assume that Boyd made a proper complaint concerning testimony about past referrals and that such testimony was inadmissible, when we view the entire record, we hold that Boyd has not shown that the testimony probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Malone*, 972 S.W.2d at 43. We overrule Boyd's second point of error.

### Conclusion

Having overruled both of Boyd's complaints on appeal, we affirm the trial court's order of termination.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: July 20, 2007

14