# NO. 12-19-00286-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

IN THE INTEREST OF

M.A.C., JR., A CHILD

§     *APPEAL FROM THE*

§     *COUNTY COURT AT LAW NO. 2*

§     *ANGELINA COUNTY, TEXAS*

## *MEMORANDUM OPINION*

J.S.C. appeals the termination of her parental rights. J.S.C.'s counsel filed a brief in compliance with *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967), and *Gainous v. State*, 436 S.W.2d 137 (Tex. Crim. App. 1969). We affirm.

## BACKGROUND

M.A.C.[1] is the father and J.S.C. is the mother of M.A.C., Jr. On May 2, 2018, the Department of Family and Protective Services (the Department) filed an original petition for protection of M.A.C., Jr., for conservatorship, and for termination of J.S.C.'s and M.A.C.'s parental rights. The Department was appointed temporary managing conservator of the child, and the parents were granted limited access to, and possession of, the child.

At trial, Knicole Porter, an investigator with the Department, testified that she received an intake report on April 11, 2018, alleging neglectful supervision of M.A.C., Jr. by his parents. At that time, M.A.C., Jr. was two months old. The allegations included concerns that both parents abused methamphetamine, M.A.C. cooked methamphetamine in the home, domestic violence occurred in the home, and the parents suffered from untreated mental health issues. According to Porter, the baby was safe and living with his maternal grandparents. Porter contacted J.S.C. at

---

[1] M.A.C.'s appeal of the termination of his parental rights has been delivered by this Court in a separate opinion.

work and she admitted that the night before, she and M.A.C. used methamphetamine while the baby was in their care. J.S.C. also admitted to domestic violence between the parents, including a fight that occurred when she tried to leave. J.S.C. said that at one point, M.A.C. threatened to "beat her like a man" if she left with the baby. Porter said that the domestic violence appeared to be ongoing.

According to Porter, the Department made a parent-child safety placement in which J.S.C. agreed to allow the baby to stay with the maternal grandparents and the Department would conduct a planned removal of the baby. Porter was concerned for the safety of both the baby and J.S.C. due to domestic violence. She stated that the actions of J.S.C. and M.A.C. placed M.A.C., Jr. in danger. J.S.C. tested positive for amphetamine, methamphetamine, alprazolam, and marijuana.

In a previous case with the Department, M.A.C.'s and J.S.C.'s older daughter tested positive for methamphetamine at birth and aspirated while in the womb. Consequently, the daughter was in the hospital for "quite some time." J.S.C. also tested positive for methamphetamine during that time. According to Porter, J.S.C. worked services and J.S.C.'s daughter was returned to J.S.C. and M.A.C., but was removed "very shortly thereafter," or within the same month. The child was removed after J.S.C. and M.A.C. were arrested and jailed on drug charges. During the incident that led to the arrest, J.S.C. was discovered trying to throw drugs, including K2, into the backseat of her vehicle to hide them, and the drugs were found on her daughter. Her daughter tested positive for cocaine and was placed with, and later adopted by, maternal relatives.

Regarding her service plan, J.S.C. completed her psychological and psycho-social evaluation, and attended two Alcohol and Drug Abuse Council (ADAC) screenings. Her first ADAC screening recommended outpatient rehabilitation. She began rehabilitation, but did not complete it. Nor did she complete her counseling, having stopped two or three sessions before completion. However, after July 2018, she consistently tested negative for drugs. Her previous Department caseworker, Christopher Barley, stated that he referred J.S.C. for services, but she did not complete them. She had regular contact with Barley, but struggled to maintain a residence and employment. Although J.S.C. was always employed, she changed jobs frequently for different reasons such as obtaining a schedule that she wanted. J.S.C.'s residence usually depended on the status of her relationship with M.A.C., sometimes living with him or sometimes living in a women's shelter.

2

According to Department caseworker, Lindsay Waterman, J.S.C. refused to provide an address and was not cooperative after Waterman took the case in March 2019. Waterman did not know if J.S.C. participated in a Burke Center evaluation or followed the Center's recommendations as required by her service plan. Barley believed that J.S.C. wanted to be a good parent, but he did not believe that she could abandon her relationship with M.A.C. or that she had the capabilities, at that time, to become a successful parent. According to Waterman and Barley, J.S.C. was more cooperative and willing to work services when M.A.C. was in jail and or she had left him. At that point, Barley stated, J.S.C. made her appointments and participated, somewhat, in her services.

J.S.C.'s visitations were sporadic. However, J.S.C. did not attend visitations with M.A.C., Jr. from November 2018 until June 7, 2019. Waterman stated that the June 7, 2019, visitation was "a little harder than anybody anticipated." She described the child as being in a room with strangers and that he was uncomfortable. The evidence also showed the caseworkers were concerned about domestic violence between the parents. According to Barley, J.S.C. went to a women's shelter because she did not feel safe living with M.A.C. Barley stated that on one occasion, J.S.C. appeared with a busted lip and admitted that M.A.C. hit her in the face. J.S.C. characterized the incident as "just a little fight" and not a big deal. One caseworker described J.S.C.'s and M.A.C.'s relationship as "toxic" and J.S.C.'s maternal stepfather stated that the intensity of their arguments disturbed him. The stepfather stated that he had to retrieve J.S.C. from M.A.C.'s house numerous times in the middle of the night.

J.S.C. claimed that most of her previous admissions about domestic violence and drug abuse were lies. Although she admitted that M.A.C. abused drugs, J.S.C. denied any violence between them. According to J.S.C., she lied in order to live at the women's shelter, telling them that M.A.C. was abusive and used cocaine. If she told the court that she was scared of M.A.C., it was not true. She did not take M.A.C. seriously when he threatened to "beat her like a man." At trial, she denied that M.A.C. ever used cocaine and claimed that she had not used cocaine since she was a teenager. She could not explain why her older daughter tested positive for cocaine. Further, she stated that she lied to Porter when she claimed that both parents used methamphetamine while in possession of the child.

Two months before trial, the parents were married by their pastor and attempted to complete their service plan, obtain a residence and employment, and visit their child. J.S.C. testified that the parents had a van and were purchasing land and a mobile home in the week after

3

trial. The evidence shows, however, that the parents' pastor owns the van. Additionally, their pastor was purchasing the land and mobile home and would allow the parents to live there and pay it off.

Both caseworkers and the CASA volunteer recommended that termination of J.S.C.'s parental rights was in the best interest of the child. According to Waterman, J.S.C.'s history indicated her instability. Barley did not believe that J.S.C. was capable of providing the stability M.A.C., Jr. needed.

At the conclusion of a bench trial, the trial court found that J.S.C. engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), (N), (O), and (P) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between J.S.C. and M.A.C., Jr. is in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.S.C. and M.A.C., Jr. be terminated. This appeal followed.

### ANALYSIS PURSUANT TO *ANDERS V. CALIFORNIA*

J.S.C.'s counsel filed a brief in compliance with *Anders*, stating that counsel diligently reviewed the appellate record and is of the opinion that the record reflects no reversible error and that there is no error upon which an appeal can be predicated. This court previously held that *Anders* procedures apply in parental rights termination cases when the Department moved for termination. *See In re K.S.M.*, 61 S.W.3d 632, 634 (Tex. App.—Tyler 2001, no pet.). In compliance with *Anders*, counsel's brief presents a professional evaluation of the record demonstrating why there are no reversible grounds on appeal, and referencing any grounds that might arguably support the appeal. *See Anders*, 386 U.S. at 744, 87 S. Ct. at 1400; *Mays v. State*, 904 S.W.2d 920, 922-23 (Tex. App.—Fort Worth 1995, no pet.).

In our duties as a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays*, 904 S.W.2d at 923. We carefully reviewed the appellate record and counsel's brief. We find nothing in the record that might arguably support the appeal.[2] *See Taylor v. Tex. Dep't of Protective & Regulatory Servs*., 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied).

---

[2] In compliance with *Kelly v. State*, counsel for J.S.C. certified that he provided her with a copy of his brief,

## DISPOSITION

We agree with J.S.C.'s counsel that the appeal is wholly frivolous.  However, we overrule counsel's motion to withdraw.  In *In re P.M.*, the Texas Supreme Court held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." 520 S.W.3d 24, 27 (Tex. 2016)*.* Accordingly, counsel's obligation to J.S.C. has not yet been discharged.  *See id*. If J.S.C., after consulting with counsel, desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief."  *See id.* at 27-28; *see also A.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-16-00543-CV, 2016 WL 5874880, at *1 n.2 (Tex. App.—Austin Oct. 5, 2016, no pet.) (mem. op.).  We *affirm* the trial court's judgment.  *See* TEX. R. APP. P. 43.2.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered February 12, 2020.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

---

informed her of her right to file a pro se response, and took concrete measures to facilitate her review of the appellate record.  436 S.W.3d 313, 319 (Tex. Crim. App. 2014).  J.S.C. was given time to file her own brief, but the time for filing such brief has expired and no pro se brief has been filed.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### FEBRUARY 12, 2020

### NO. 12-19-00286-CV

### IN THE INTEREST OF M.A.C., JR., A CHILD

Appeal from the County Court at Law No. 2
of Angelina County, Texas (Tr.Ct.No. CV-00282-18-05)

THIS CAUSE came to be heard on the appellate record and brief filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*