# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00450-CV

---

**M. M. H.-A., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 353RD DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-19-002261, THE HONORABLE DARLENE BYRNE, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant M.M.H.-A. (Mother) appeals from the district court's decree, following a bench trial, terminating her parental rights to A.H.-A. (the child). The mother's court-appointed counsel has filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967). We will affirm the district court's decree of termination.

The case began in April 2019, when the Texas Department of Family and Protective Services (the Department) received a referral alleging neglectful supervision of the child by Mother. According to Kayla Rascon, the Department's conservatorship supervisor for the case, the referral alleged that Mother "was high off of K2 on I-35 and 6th Street, and she had [the child] in a stroller, and was walking across the highway with [the child]." A Department investigator responded to the report and found Mother and the child under the bridge at I-35. Mother told the Department investigator that she had been living under the bridge for 34 years,

that she was "trying to get some dick," and that she had ten children "but didn't know where they were." The child, who at that time was approximately one year old, "had dirty clothes," "food around her face," "was wearing shorts but no diaper," had "long fingernails and dirty hands," and a "cigarette smell in her hair."

The Department initiated an emergency removal of the child from Mother's care. Meanwhile, Mother was transported to Austin Lakes Hospital for a mental-health evaluation. Upon her discharge from the hospital later that month, Mother was charged with the offenses of burglary of a building and child endangerment and jailed at the Travis County Correctional Complex. In July 2019, Mother was transferred to Austin State Hospital for a competency evaluation and, in late September 2019, was transferred to a competency restoration program run by Integral Care, a community center in Travis County. Mother was found competent to stand trial in January 2020.[1]

To obtain reunification with the child, Mother was ordered to complete several services, including random drug testing, therapy, and parenting classes. She was also required to maintain contact with the Department. According to Rascon, Mother "attempted to complete some" of her services. Mother took some parenting classes but did not complete them, and she took thirteen drug tests but missed five.[2] She participated in therapy but was discharged unsuccessfully in July 2020 "due to excessive no shows."

Mother visited the child on multiple occasions. Rascon testified that Mother's initial visits with the child "went really well," but eventually the child began exhibiting

---

[1] At the time of the termination trial, Mother's criminal charges remained pending.

[2] Mother tested positive for opiates on three of the tests but provided Rascon with a doctor's note indicating that she had been prescribed Hydrocodone.

"aggressive behavior" toward others after the visits had concluded. Consequently, beginning in May 2020, the Department reduced the number of visits between Mother and the child.

In response to the reduced visitation, Mother called Rascon and told her that she was contemplating suicide. Mother also stopped attending therapy sessions, began missing visits with the child, failed to complete a drug test, and stopped communicating with the Department. Attempts by Mother's therapist, the police, and Rascon to contact Mother were unsuccessful. Eventually, Rascon found Mother outside Mother's apartment and noticed that "she just looked very different, you know, really red faced. Her lips were bluish. She was slurring her words." Rascon asked Mother if she was okay but Mother did not respond and instead "turned around and went inside." After that encounter, Mother's communication with the Department and participation in services was "inconsistent." Mother had one visit with the child in June but missed the next two visits. At around the same time, Rascon noticed that the child "started disconnecting" emotionally with Mother, who had stopped receiving mental-health treatment and was becoming increasingly agitated during the visits. After Rascon ended one visit due to what she characterized as Mother's "inappropriate behavior," Mother called Rascon, screamed at her, and threatened to have a family member "f**k [her] up."

The child's first placement with a foster family was unsuccessful because of the child's aggressive behavior. However, according to multiple witnesses, the child was doing well in her current placement. The child's current foster parents were trained in Trust Based Relational Interventions (TBRI) and had demonstrated some success in improving the child's behavior. Rascon did not believe that Mother was able to provide for the child's needs but that the foster parents were. CASA volunteer Gemma DeLeon provided similar testimony. She had observed the child interact with the foster parents. Based on her observations, DeLeon described

3

the relationship between the child and the foster parents as "[l]oving and secure." She added that the child was "happy" and looked to her foster parents "to feel safe" and to provide "affirming words and care." One of the foster parents testified that she and her wife loved the child and wanted to adopt her. She explained,

> We want to adopt [the child] because we have gotten to be attached to her and her to us. We love her. And she tells us often that she loves us and this is her home, and Sadie keeps her safe, and Sadie is her dog. And we want to have the—we want to have the opportunity to help her grow and give her everything that she deserves. She is a really incredible—incredible child and we want to be able to parent her and give her a safe home.

The Department's plan for the child was adoption by the foster parents.

Mother testified at trial. When asked to explain what went wrong "to where CPS is no longer seeking to reunify you with [the child]," Mother testified, "I think it was just lack of communication. And when the COVID virus hit it just—it was not the same and just—we were not able to complete our services." Mother claimed that she had been "doing a great job" in the case and "moving in the right direction" until the onset of COVID restrictions in March 2020, when she "just got discouraged." Mother believed that by taking parenting classes, she had "learned to be a better nurturing, caring, loving, guiding, just individual." Mother also testified that she and the child "have a really good bond" and that she "just love[s] that little girl."

When asked why she had stopped attending therapy, Mother testified that she "was told that [her therapist] was going on vacation" for two weeks and that she "didn't hear from her after that." Mother claimed that she was scheduled to meet with another therapist the day after trial. When asked why she had stopped taking drug tests, Mother testified that she had lost her phone and "didn't know that [she] was supposed to go do one." She added, "And it took

4

me about three weeks to get situated. So I guess, within that time period, I must have missed a couple." Mother testified that moving forward, she was "willing to do drug test[s], parenting classes, anything, any kind of services" to obtain reunification with the child. She testified that adoption of the child by the foster parents "would hurt me very much." She explained, "[S]he is all I have, I mean, really—and I am all she has, and we need each other."

On cross-examination, Mother testified that she did not remember any of the events that occurred on the day when she and the child were found under the bridge and the child was removed from her care. Also, Mother either denied or claimed not to recall missing five of the last seven scheduled visits with the child, telling the caseworker that she was contemplating suicide, threatening the caseworker with physical violence, ceasing communication with the Department in July 2020, and receiving calls from her therapist.

At the conclusion of trial, the district court found by clear and convincing evidence that Mother had failed to comply with the provisions of a court order that established the actions necessary for her to obtain the return of the children, *see* Tex. Fam. Code § 161.001(b)(1)(O), and that termination of Mother's parental rights was in the best interest of the child, *see id.* § 161.001(b)(2). Based on these findings, the district court terminated Mother's parental rights. This appeal followed.

Court-appointed counsel has filed an *Anders* brief and a motion to withdraw as counsel, concluding that the appeal is frivolous and without merit. *See* 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights because it "strikes an important balance between the defendant's constitutional right to counsel on appeal and counsel's obligation not to prosecute frivolous appeals" (citations omitted)). The brief meets the requirements of *Anders* by

presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). Counsel has certified to this Court that she has provided her client with a copy of the *Anders* brief and informed her of her right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. After reviewing the entire record and the *Anders* brief submitted on Mother's behalf, we have found nothing in the record that might arguably support an appeal. We agree with counsel that the appeal is frivolous. Accordingly, we affirm the district court's termination decree. We deny counsel's motion to withdraw.[3]

 

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed: December 4, 2020

---

[3] The Texas Supreme Court has held that the right to counsel in suits seeking termination of parental rights extends to "all proceedings [in the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27-28 (Tex. 2016) (per curiam). Accordingly, if after consulting with counsel Mother desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.*