# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00215-CV

---

**F. M., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
NO. 20-1555, THE HONORABLE MELISSA MCCLENAHAN, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant F.M. (Father) appeals from the district court's order, following a bench trial, terminating his parental rights to his daughters A.M., born July 4, 2007, and C.M., born September 19, 2008 (the children). Counsel for Father has filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967). We will affirm the district court's order of termination.

At trial, the district court heard evidence that the case began in July 2020, when the Texas Department of Family and Protective Services (the Department) received a report alleging that the mother of the children (Mother) was using morphine and buying marijuana for A.M., who was at the time twelve years old. In the Department's initial affidavit in support of court-ordered services, Department investigator Connie Castillo averred that the Department had concerns regarding Mother's and Father's "drug use and unstable living conditions." Castillo explained:

Several close relatives have stated that the parents are on methamphetamines and [Mother] is a drug dealer. [Mother] was recently arrested on five charges involving drug possession and delivery. The parents' appearance shows signs of drug use, and they have had significant weight loss according to family members. The children are within the same room in which methamphetamine is potentially being used. There are serious concerns that the children could be exposed to methamphetamines. Furthermore, there are concerns that if [Mother] is selling drugs that she has left her children in extremely dangerous situations.

The Department also had concerns regarding Father's criminal history, which included charges for possession of methamphetamine, theft, and assault-family violence committed against Mother. Officers with the San Marcos Police Department provided testimony relating to these charges. Officer Ashley Allen testified that on December 28, 2019, she responded to a call of a disturbance involving Mother and Father at a motel. When Allen arrived, Father had left the motel but Mother was still there. Allen testified that she spoke with Mother, who told her that she and Father had a verbal altercation "about finances and her basically being the only one working and paying for things, and [Father] not paying or working." Mother also told Allen that Father had physically assaulted her during the altercation. Allen explained,

So, initially, it started as a verbal altercation. At which time, things got heated between the two. They were standing up in the hotel room. And . . . [Mother] said [Father] was telling her—you know, he kept saying, "hit me." Elbowed her across the face. Then she began to shove him back and then eventually it led to him punching her in the cheek with a closed fist.

Allen observed that Mother "appeared visibly upset and shaken," "was crying," and had "redness and swelling" on her left cheekbone. Mother further told Allen that she and Father "had been

2

together 14 and a half years, and the last four—in the last four there had been violence; physical violence." When Father was later interviewed by police, he told Officer Michael Taylor that Mother was the aggressor. Taylor testified:

> So, he said that he was sitting on the side of the bed in the hotel room. And [Mother] came in yelling at him. And things got physical. She—he said—he claimed that she hit him on the side of the face and also scratched him. But I was—me and the other officer that were on scene were unable to locate any injuries consistent with those claims.

Following this incident, Father was arrested for and charged with assault-family violence.

Another incident involved Mother and Father stealing from a Walmart in San Marcos. Officer Logan Murphy testified that on September 5, 2019, he was dispatched to a theft in progress at the Walmart and encountered and arrested Mother and Father as they were attempting to exit the store with stolen merchandise. Murphy added that when Father was subsequently searched, "[o]n his person was crystal methamphetamine, approximately 1.2 grams of it, located inside of his pocket."

Department caseworker Kalyn Noyes testified that when the case began, the Department asked Mother and Father to submit to hair-follicle drug testing. Noyes testified that Mother tested positive for methamphetamines and cocaine but that Father's test could not be completed because he submitted an "insufficient amount of [hair] specimen" for testing. Noyes asked Father to retake the test but he "did not go." Following Mother's positive test results, the children were removed from their parents' care and Mother and Father were ordered to complete services, including an "intensive out-patient program for substance abuse treatment." Neither Mother nor Father completed the program. Father was also ordered to submit to a "nail drug screen," which he failed to do.

3

As part of Mother's court-ordered Family Service Plan, she completed a psychological evaluation, a copy of which was admitted into evidence. In the evaluation, which was conducted in December 2020, the psychologist who interviewed Mother wrote that Mother described her relationship with Father as "the first ten years were pretty good and the last six have sucked. . . . The drug use messed him up. He started becoming abusive after that. He's still using. [She] had to move out in September because there was always a bad argument."

Noyes testified that Father had not complied with the terms of his court-ordered family service plan. He failed to complete a drug and alcohol evaluation, participate in individual therapy, participate in parenting classes, participate in a batterer's intervention program, or comply with any drug test requests. Mother had also failed to comply with several of her court-ordered services. Noyes explained that Mother's and Father's visits with the children had been suspended in January 2021 due to their "[l]ack of engagement in addressing the Department's concerns."

Noyes further testified that the Department's plan for the children was non-relative adoption and that they had been placed in a foster home since October 2020. Noyes recounted that prior to being placed in foster care, the children "never wanted to go to school. They didn't want to engage in therapy. They were just very disengaged. And now they are very talkative. They love to tell me all of the things that are going on." She added that the children now have "good role models with their foster parents." When asked if the children had expressed their desires to her, Noyes testified, "The girls do want to be adopted by the current placement. They state that going home at this time would be—their parents would be strangers to them and they don't know how they could go back." Noyes also testified that the children appeared bonded to their foster parents and that the foster home was meeting the children's

4

needs for discipline, stability, and protective parenting. She did not believe that Mother and Father were capable of providing for those needs, and she testified that she would be concerned for the children's safety if they were returned to Mother and Father because of their drug use, risk of arrest and incarceration, and history of domestic violence.

Terri Hamilton, the children's guardian ad litem, testified similarly regarding her concerns for the children's well-being if they were returned to Mother and Father. She was concerned about "the drug use, the violence, the domestic violence charges, making sure that the girls weren't exposed to, you know, the drug use or being invited to use drugs . . . . That type of thing." Hamilton explained that the drug use was an ongoing concern because in a meeting with Mother and Father in December 2020, they both admitted to her that they had used drugs that month. Hamilton also testified that she had talked to the children, and they told her that "they don't want to live with their parents. They have found stability and rules and direction and comfort in the house that they're living in now." When asked why she believed terminating Mother's and Father's parental rights was in the best interest of children, Hamilton testified, "The girls are safe. They . . . feel safe. They've both expressed that to me. They . . . want to live a normal life. And what they were living before . . . was not normal. They . . . enjoy their life. They enjoy going to school. They enjoy just being with . . . you know, real parents."

The foster father, John McGuire, testified that that the children were doing well in adapting to their new home and that he and his wife wanted to adopt both children. When asked whether he was aware "if that is what the girls also want," McGuire testified, "Yes. We have . . . talked with them about it, and they do have that same desire."

At the conclusion of trial, the district court found that termination of Mother's and Father's parental rights was in the best interest of the children and that Mother and Father had:

5

(1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (3) constructively abandoned the children who have been in the temporary managing conservatorship of the Department of Family and Protective Services for not less than six months; and (4) used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program or, after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance. See Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (P), (2). This appeal by Father followed.[1]

Court-appointed counsel has filed an *Anders* brief and a motion to withdraw as counsel, concluding that the appeal is frivolous and without merit. *See* 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights because it "strikes an important balance between the defendant's constitutional right to counsel on appeal and counsel's obligation not to prosecute frivolous appeals" (citations omitted)). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). Counsel has certified to this Court that she has provided her client with a copy of the *Anders* brief and informed him of his right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

---

[1] Mother did not file a notice of appeal from the district court's order.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. After reviewing the entire record and the *Anders* brief submitted on Father's behalf, we have found nothing in the record that might arguably support an appeal. Our review included the district court's endangerment findings, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), and we have found no issues that could be raised on appeal with respect to those findings, *see In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). We agree with counsel that the appeal is frivolous. Accordingly, we affirm the district court's termination order. We deny counsel's motion to withdraw.[2]

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: August 19, 2021

---

[2] The Texas Supreme Court has held that the right to counsel in suits seeking termination of parental rights extends to "all proceedings [in the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27-28 (Tex. 2016) (per curiam). Accordingly, if after consulting with counsel Father desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an Anders brief." *See id.*