# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00550-CV
### NO. 03-21-00551-CV

---

**T. S. A., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 421ST DISTRICT COURT OF CALDWELL COUNTY
NOS. 20-FL-289 & 20-FL-289-A,
THE HONORABLE THOMAS NATHANIEL STUCKEY, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

Mother T.S.A. appeals from the trial court's orders terminating her parental rights to her sons "Mike" and "Matt," who were six and four at the time of the final hearing.[1] Mother's court-appointed attorney has filed an *Anders* brief explaining that he has concluded that the appeal is without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967).

The Texas Department of Family and Protective Services presented evidence that the police responded to a report of "a small child in the street unattended in a diaper." The responding officer approached a shed in the back yard, smelled marijuana, and saw four people in the shed using marijuana and methamphetamine. One of the men, later confirmed to be

---

[1] For the children's privacy, we refer to them and other family members by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Matt's father's rights were also terminated but he is not a party to this appeal. Mike's father's rights were not terminated.

Mother's boyfriend, was known to the police due to his criminal history involving "[n]arcotics, family violence, [and] Class C misdemeanors." During the officer's visit, Mother came out from the house looking like she had just woken up and had not showered or changed her clothes in a few days. Mother was "kind of nonchalant" about Matt having been out in the street unattended, and the officer "smelled a heavy odor of unburnt marijuana" coming from the house. The Department was called, and an investigator spoke to Mother, who said that she had nothing to do with the drugs found in the shed, that she had been asleep in the house asleep the whole time, that she thought her boyfriend was watching Matt, and that she had recently learned that Matt could open the door by himself and was trying to "figure something out to keep him from doing that." Mother agreed to take urine and hair-follicle drug tests, which returned positive results for marijuana and methamphetamine, but she "adamantly denied" using anything other than marijuana. When the investigator asked how methamphetamine could have gotten into her system, Mother "explained that it could be in the cocaine that she sales [sic] or the marijuana that she smokes," but then later denied she had told the investigator she was selling drugs.

Matt was placed with "Maria," a family friend, and Mike was placed with his father "Brad," with whom he had been staying at the time the police were called about Matt. Soon after he was placed with her, Matt "started having white bowel movements," and Maria brought him to the emergency room, where a "doctor confirmed that he has anemia" and was supposed to be taking medication. Mother told the investigator that she knew Matt was anemic, that a doctor had given him medicine, and that she was giving Matt "over the counter vitamins." The doctor reported to the Department that although Mother was supposed to bring Matt back for a check-up, the child had not been back in more than six months. The doctor did not know if Mother had ever picked up or refilled Matt's prescription. The investigator found "reason to

2

believe for both neglectful supervision of both of the children and medical neglect for" Matt, and he testified that Mother engaged in endangering conduct by failing to provide Matt with his prescription medication and by selling cocaine while caring for two small children.

The Department prepared a safety plan for Mother, but her caseworker testified that she had not complied with most of the requirements, including drug testing, completing a parenting class, undergoing a psychological evaluation, completing a follow-up drug and alcohol assessment, providing proof of employment, or successfully completing therapy. She had also missed fifteen of twenty-seven visits with the children. The Department believed it was in the children's best interest for Mother's rights to be terminated because the case had been pending for more than a year and, in that time, Mother had not "been able to alleviate one concern that . . brought both the children into her care"—she had not maintained sobriety, she did not seem to have learned anything during the case, and she did not "engage in any services or make any type of behavioral changes." The caseworker worried that if Mother's rights were not terminated, she could endanger the children if she had contact with them while she was under the influence. Mother reported that she had been diagnosed with "[a]nxiety, depression and then bipolar" and prescribed "Xanax, Lexapro, Procardia, and Zoloft" but that was not taking those mediations because she "didn't want to rely on them." Instead, she used marijuana to calm herself down, smoking twenty joints a day.

At the time of the final hearing, Matt was still living with Maria, who hoped to adopt him if Mother's rights were terminated, and Mike was still living with Brad, who the Department believed should be named sole managing conservator. The caseworker said Matt had "grown so much" and was thriving with Maria, who was "meeting all of his needs and more," taking him to all of his medical and therapy appointments, and providing him with "a safe

3

and stable environment that is drug free." The caseworker said Matt had "come such a long way," from not knowing how to speak or interact with other children to "starting to talk a lot more," being active and social, and wanting to play. The caseworker did not have any concerns about Brad being Mike's sole managing conservator and said that Brad had been a safe and appropriate parent and that Mike "has continued to do well in his home."

Maria testified that when Matt arrived about a year earlier, he was speech delayed and "would cry because that's the only way he could communicate." He had few social skills, ate very little, was not toilet-trained, and would scream every time she put him on the toilet. Since the emergency room visit, Matt had been taking prescription iron every day and gets "blood work done frequently." He has between fifteen and twenty appointments a month, seeing an occupational therapist and a speech therapist twice a week, along with going to an eye specialist for "eye drifts," and an ear, nose, and throat specialist. Matt has started to like school, is active and social, has "grown tremendously," is "doing a lot more than he was doing at the very beginning," is toilet trained, talks, and is happy. Maria said, "I love [Matt], I am very much attached to him. . . . And he is just a really good kid." Maria did not believe Mother had "done the things that she needed to do to have her son," noting that Mother had missed about half of her visitations. Maria had concerns about Matt's safety if he were returned because she thinks Mother might be homeless. More importantly, she has "huge concerns" about Mother's drug use because "when she is doing drugs, and she is high or under the influence, how is she going to handle an active three-year-old?" Maria is committed to making sure Matt and Mike maintained a relationship and said they have a "very much well-kept bond" and "love each other very much." Mike lives with his father Brad, and the Department agreed that Brad should be named

the child's sole managing conservator. Brad and Maria are on good terms and intend to maintain relationships between the children and with "Andrew," the children's maternal grandfather.

Andrew testified that he has a "great" relationship with Brad and Maria and said that Maria "does an amazing job" with Matt, who "has come a long way." Andrew supported the Department's plan to have Maria adopt Matt, saying that Matt "needs a stable environment," that Matt and Maria love each other, and that Matt "needs extra above and beyond just, I think, normal so-called childhood and she gives that to him." He believed it was in the children's best interest for Mother's rights to be terminated so Matt could be adopted by Maria and so Mike could remain in Brad's sole care, saying Mother "just hasn't done what she is supposed to do." Brad testified similarly, saying that Mother had changed in recent years and was not a safe parent. Brad believed Maria was providing Matt with a good home, and he testified that he thought it was in the children's best interest for Mother's parental rights to be terminated.

Mother testified that on the day the police were called, she and Matt had been taking a nap together when he had gotten out of bed and let himself out of the house, and that she went to the store that same day to buy a child safety lock to stop it from happening again. Mother insisted that she had given Matt his prescription iron medication until he was two and at the time of his removal was weaning him off the prescription and onto over-the-counter iron supplements, as the doctor had instructed. Mother denied smoking marijuana the day Matt got outside, denied that her then-boyfriend was supposed to be caring for Matt, and denied knowing that her boyfriend and the other people were in the shed using drugs. She said she did not recall telling the investigator that she sold cocaine, noting that her drug test was negative for cocaine.

Mother testified that she had tried to work her required services but said she had been evicted and had trouble with internet connectivity. She admitted that she had missed all the

drug tests requested by the Department after her initial test. She said she did not test because she was "bitter" about the situation and because she "just didn't feel the severity of these little drug tests," although she acknowledged that she had been ordered by the trial court to test and that she knew she could not regain custody without testing. Mother acknowledged that she had tested positive for methamphetamine but insisted she had never used it. She admitted that she had smoked marijuana since she was young and that she smoked twenty joints a day, saying that it eases her mind and "relaxes [her] and makes [her] forget about a lot of things." However, she insisted that she had never been a bad or neglectful parent and that her children were never in danger. Mother did not think it should matter if she used marijuana if the children were not present but admitted that although she "tried not to," she had smoked marijuana "from time to time" while her children were in her care. Mother stated, "I just knew that this whole case—I mean, no matter what I tested dirty for, you know, I have never been a neglectful mother. My kid getting out of the sliding door does not show how I'm neglectful to my kid."

The trial court signed orders finding that termination was in the children's best interest and that Mother had placed or allowed the children to remain in conditions or surroundings that endangered their well-being, that she had engaged in conduct or placed the children with others who engaged in conduct that endangered the children's well-being, that she had constructively abandoned the children, and that she had failed to comply with a court order establishing the actions necessary to regain custody. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (N), (O), (2).

On appeal, Mother's court-appointed attorney has filed a motion to withdraw supported by an *Anders* brief, concluding that the appeal is frivolous and without merit. *See* 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam) (approving use of

6

*Anders* procedure in appeal from termination of parental rights). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Reg. Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied). Counsel has certified to this Court that he provided Mother with a copy of the *Anders* brief and motion to withdraw and advised her of her right to examine the appellate record and to file a pro se brief. To date, Mother has not filed a pro se brief.

We have conducted an independent review of the record, including the *Anders* brief submitted on Mother's behalf. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. We have found nothing in the record that might arguably support an appeal and agree with counsel that the appeal is frivolous and lacks merit. Accordingly, we affirm the trial court's decree terminating Mother's parental rights. Counsel's motion to withdraw is denied.[2]

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed: February 4, 2022

_____

[2] The Texas Supreme Court has held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). Accordingly, counsel's obligation to Mother has not yet been discharged. *See id.* If Mother, after consulting with counsel, desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.* at 27-28.