# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00375-CV

### T. M. and J. B., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

#### FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
#### NO. 22-0017-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellants T.M. (Mother) and J.B. (Father) each appeal from the trial court's order, following a jury trial, terminating their parental rights to their one-year-old son J.M. (Jason).[1]  In each appeal, Mother's and Father's court-appointed counsel has filed a motion to withdraw and an *Anders* brief concluding that the appeal is frivolous and without merit.  *See Anders v. California*, 386 U.S. 738, 744 (1967); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights).  Each brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal.  *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied).  Counsel has certified to this Court that he has

---

[1] For the child's privacy, we refer to him using a pseudonym and to his parents and other relatives by their familial relationships to each other, and we refer to the child's approximate age at the time of trial.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

provided Mother and Father with a copy of the *Anders* brief and informed them of their right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. In March 2022, the Texas Department of Family and Protective Services (the Department) received a report alleging neglectful supervision of Jason by Mother. Following an investigation,[2] the Department filed a petition seeking the termination of Mother's and Father's parental rights. The case proceeded to a four-day jury trial.

At trial, Department investigator Tee Martin testified that Mother gave birth to Jason at home and, immediately thereafter, went with Jason to a hospital, where she and Jason both tested positive for amphetamines.[3] When Martin interviewed Mother at the hospital, she initially denied using methamphetamine but eventually admitted that she had used methamphetamine "at least two to three times monthly throughout the pregnancy" and as recently as three weeks before Jason was born. Mother acknowledged that her methamphetamine use was "a problem" but believed "she could quit whenever she wanted to" and "said it is like just smoking a cigarette."

Martin also spoke with Father at the hospital. Martin testified that the Department would not let Father take Jason home from the hospital because "[Father] was also listed in

---

[2] The investigation is summarized in the Department's removal affidavit, a copy of which is included in the clerk's record. However, the removal affidavit was not admitted into evidence at trial. Although the Department offered it into evidence, counsel for Mother objected to the admissibility of the affidavit on hearsay grounds, and the trial court sustained the objection. Department investigator Tee Martin provided testimony describing the investigation.

[3] Mother testified that she went into labor unexpectedly at Father's house and gave birth to Jason there. Father called 911, and an ambulance transported Mother and Jason to a hospital.

another CPS case related to his 3-year-old son" and "there were concerns for drug use by [Father] in that case."[4] The Department also would not let Father's mother (Paternal Grandmother) take Jason home from the hospital because there were concerns that Paternal Grandmother had allowed Father to be with his other son unsupervised. Martin asked Father if he would be willing to take a drug test to alleviate the Department's concerns, and Father said that he would. However, Father did not take a drug test during the investigation. When Martin later asked Father about why he had not tested, Father "basically told me that we don't know anything about him, we're just kidnapping his son."

Approximately one week after the case began, Jason was ordered removed from Mother and Father and was placed in a foster home. Foster Mother testified that her household was composed of her, her husband, their four-year-old adopted son, and Jason. Foster Mother recounted that when Jason first came into their care, he had developmental delays and many medical needs, and she and her husband were able to meet those needs and take Jason to his medical appointments. She testified that Jason "has come a long way" since the beginning of the case but acknowledged that he is "still very behind" for his age. Foster Mother explained:

> He started physical therapy at 4 months old, which I never thought a baby that young would need physical therapy. . . . He sees a physical therapist twice a week, he sees an occupational therapist twice a week, and now he is doing speech and feeding therapy once a week. He is almost 15 months, and he still is not walking, so that is a concern.

---

[4] This child, who was another child of Mother and Father, also tested positive for amphetamines at birth. Mother and Father had voluntarily relinquished their parental rights to this child in a prior CPS case, and he was in the custody of Paternal Grandmother at the time of trial.

Foster Mother further testified that Jason was very bonded with her, loves her husband, and "adores" their adopted son. The family's goal was to adopt Jason, and they also wanted him to get to know his biological family "as long as it was a safe situation."

Both Mother and Father testified. Mother testified that she had eight children, including Jason. She had voluntarily relinquished her parental rights to four of those children and had her parental rights to the other three children involuntarily terminated. She explained in detail the circumstances surrounding her prior CPS cases, which included allegations that one of her ex-boyfriends had sexually abused one of her children and another ex-boyfriend had assaulted her in front of her other children.

Mother also testified that she had pending criminal charges in Hays County for burglary of a habitation and possession of a controlled substance, methamphetamine. She invoked the Fifth Amendment when asked further questions related to her arrest for methamphetamine possession. However, Mother admitted that she had used methamphetamine in the past, including when she was pregnant with Jason, but testified that she no longer used it. Mother acknowledged that using methamphetamine while pregnant can be harmful to a child and could be considered child abuse. Mother agreed that she had endangered Jason by using methamphetamine while pregnant with him and agreed that she did not complete her court-ordered services, including individual counseling, a psychological evaluation, domestic-violence classes, and drug testing, although she had completed a drug and alcohol assessment.

At the time of trial, Mother worked for multiple ride-sharing and food-delivery companies. While the case was ongoing, Mother had resided with friends. She had found an

4

apartment but had only recently moved into it, and that was where she planned to live with Jason. Mother testified that she was no longer in a relationship with Father.

Father testified that he had been in a relationship with Mother for "four to five years," although "[i]t wasn't always intimate." They were friends before they dated, and they sometimes used methamphetamine together, although not regularly. They occasionally used methamphetamine without each other's knowledge, which created difficulty in their relationship. Father testified that although he and Mother were no longer in a relationship at the time of trial, they did "get along." Father acknowledged that he had not completed his court-ordered services, including parenting classes, outpatient drug treatment, and drug testing. When asked if he did drugs during the case, Father testified, "Real seldomly here or there." However, he later clarified that his drug use was during the prior CPS case involving his other son and that he had not used drugs since Jason was born. When he had used drugs, methamphetamine was his "drug of choice," although he had used cocaine and marijuana when he was younger. Father testified that he had been sober since September 2019, although he acknowledged that he had relapsed on methamphetamine either "twice" or "a few times" since then. Father could not recall the last time that he had used methamphetamine. He acknowledged that it was possible that he could relapse in the future.

Father admitted to engaging in domestic violence in the past but testified that it was not with Mother or any other woman. Father testified that the violence involved his father and that he and his "dad have gotten into it a few times" because "[g]uys get in conflicts." One of those conflicts had resulted in Father being charged with aggravated assault with a deadly weapon, although that charge was later dismissed. Father testified that he had been arrested "maybe ten times total," four of which involved drug charges, and he currently had pending

5

charges in Hays County for possession of methamphetamine and endangering a child, specifically his other child with Mother. Father invoked the Fifth Amendment in response to the Department's questions related to those charges. Father also had a pending charge in Williamson County for theft.

Father currently lived in a house that was rented by Paternal Grandmother. He had lost a security job because of his pending criminal charges and was working part-time as a mobile mechanic at the time of trial. Father acknowledged that he was "not financially stable to have a baby right now" and "not ready" to take care of Jason, but until he was ready, he "really want[ed] [Jason] to go to a family member" such as Paternal Grandmother or Father's brother who lived in Midland. Father later acknowledged that it was "not fair for [Jason] to have to wait at all" for Father to be ready to take care of him, and Father further acknowledged that Jason's current placement was safe and stable and that Jason's foster parents were "good people" with a "good home," who were meeting Jason's needs.

Department caseworker Demont Jenkins testified that Mother and Father engaged in some court-ordered services but not others. One of the services in which they did not engage was submitting to regular drug testing. Jenkins testified that consequently, "it's difficult to say if the parents are clean consistently or if they made the changes necessary to be a safe place for [Jason] to return to." The Department's plan for Jason was for him to remain with the foster family, and Jenkins testified that Jason was "doing very well at his placement." Jenkins explained that the foster family was a loving family, their home was safe and stable, and the foster parents were able to care for all of Jason's physical and medical needs, including taking him to "100 percent" of his medical appointments.

Leah Carr, the CASA volunteer assigned to the case, testified that the foster home was "very cozy" and "very safe" for Jason, with food, toys, musical instruments, and "everything that you would think should be in a home with a toddler [] in there. But also clean, kept well, just a cozy home." Carr added that Jason and the foster parents' son are "best friends, buddies" and that "[t]hey light up when they see each other. They have a bond that is very strong, just like you would have with your own siblings." Carr believed that it was in Jason's best interest to remain in his current placement and be adopted by his foster family.

Other witnesses at trial included Deputy Andres Vega of the Hays County Sheriff's Office, who arrested Father in March 2021 for possession of methamphetamine, which was found in Father's vehicle during a traffic stop, and for endangering a child, specifically his other child with Mother, who was in the vehicle with Father at the time of the traffic stop; Department caseworker Lisa Gaytan, who testified that the home study on one of Father's proposed placements, his brother, was not completed because the brother had indicated that he no longer wanted to be considered as a placement for Jason and that, even if he did, the placement likely would not have been approved because of the brother's criminal history and other issues; hospital social worker Jessica Suarez, who testified that Jason had shown symptoms of methamphetamine withdrawal at the hospital after he was born; and Paternal Grandmother, who testified about the circumstances surrounding her adoption of Father's other child and her relationship with Father and Mother. Documentary evidence admitted at trial included copies of Mother's and Father's family service plan; Mother's medical records from the hospital following Jason's birth; various court orders made during the prior CPS cases involving Mother's other children; Father's 2022 indictment for possession of methamphetamine and endangering a child; and judgments of conviction for other crimes that Father had previously committed.

7

At the conclusion of trial, the jury found by clear and convincing evidence that Mother had: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child; and (4) been the cause of the child being born addicted to a controlled substance. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (R). The jury found by clear and convincing evidence that Father had failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child. *See id.* § 161.001(b)(1)(O). The jury further found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the child's best interest. *See id.* § 161.001(b)(2). In accordance with the jury's verdict, the trial court ordered Mother's and Father's parental rights to Jason terminated. These appeals followed.

After reviewing the entire record and the *Anders* briefs submitted on Mother's and Father's behalf, we have found nothing in the record that might arguably support an appeal. Our review included the endangerment findings for Mother, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), and we have found no issues that could be raised on appeal with respect to those findings, *see In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). We agree with counsel that each parent's appeal is frivolous.

**CONCLUSION**

We affirm the trial court's order of termination.[5]

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed:   September 28, 2023

---

[5] We deny counsel's motions to withdraw. The Texas Supreme Court has held that the right to counsel in suits seeking termination of parental rights extends to "all proceedings [in the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27-28 (Tex. 2016) (per curiam). Accordingly, if after consulting with counsel, Mother or Father desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.*