# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-25-00366-CV

---

**C. G., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF HAYS COUNTY
NO. 23-3194, THE HONORABLE JESSICA DEVANEY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant C.G. (Mother) appeals from the district court's order, following a bench trial, terminating her parental rights to her son, A.M. (Adam), who was approximately ten years old at the time of trial.[1]  Mother's court-appointed counsel has filed an *Anders* brief concluding that the appeal is frivolous and without merit.  *See Anders v. California*, 386 U.S. 738, 744 (1967); *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from termination of parental rights).  The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal.  *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.—Austin 2005, pet. denied).

---

[1]  For the child's privacy, we refer to him using a pseudonym and to his parents and other relatives by their familial relationships to each other.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

Counsel has certified to this Court that she has provided Mother with a copy of the *Anders* brief and informed her of her right to examine the appellate record and to file a pro se brief. In response, Mother has filed a pro se brief in which she asserts that termination of her parental rights was improper for various reasons. Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647.

Mother's parental rights to Adam were previously terminated in 2022 based in part on a finding that Mother had endangered Adam by using illegal drugs, specifically methamphetamine. However, this Court vacated the order terminating Mother's parental rights and dismissed the case against her after concluding that the automatic dismissal deadline had passed and that the district court had lost jurisdiction over the case before it terminated Mother's parental rights. *See C.G. v. Texas Dep't Fam. & Protective Servs.*, No. 03-22-00383-CV, 2023 WL 3027468, at *6 (Tex. App.—Austin Apr. 21, 2023, no pet.) (mem. op.). The Department opened a new case involving Mother in November 2023, seeking to have her complete various court-ordered services, including drug testing. After Mother failed to drug test, the Department sought and obtained emergency removal of Adam from Mother's care and placed him with E.D. (Father) and Father's sister (Paternal Aunt). Mother subsequently tested positive for methamphetamine, after which the Department sought termination of Mother's parental rights to Adam.[2]

---

[2] Father also tested positive for methamphetamine during the case and was not allowed to live with Adam after that. However, the Department ultimately did not seek termination of Father's parental rights and instead sought to have him appointed possessory conservator because he had been "mostly compliant" with his court-ordered service plan. The record reflects that Father was aligned with the Department during trial.

The case proceeded to a two-day bench trial. Witnesses at trial included Department caseworkers Angelica Chavira and Kathryn Garbutt, Paternal Aunt, CASA volunteer Trent McCarty, and Mother.

Caseworker Chavira testified that when the current case began in November 2023, the Department had concerns for Mother's "drug use, mental health, and possibly not having a home." When Chavira first met with Mother, Mother "kept saying that she was suing CPS and she was in a lawsuit" against the Department. Mother was speaking "very rapidly and moving around a lot," which suggested to Chavira something "possibly more" than Mother being merely upset. Mother refused to let Chavira speak to Adam and told her to speak with her lawyer, whom Mother did not identify, and Chavira had difficulty contacting Mother after that. She explained,

> I tried to contact [Mother] from November to December, and there [were] several excuses that I received. She had COVID. She dropped her phone. She broke her phone. It was—it was always just some reason why we couldn't meet up or assess her. She also tried to go to the office, and then she never showed up. She wouldn't provide an address or any information or even tell me where the child was in school.

Chavira further testified that Mother and Father were both ordered to drug test when the case began, that Father complied but Mother did not, and that Mother failed to drug test at any point when Chavira was on the case.

Caseworker Garbutt, who took over the case in February 2024, similarly testified that Mother had been "inconsistent" in communicating with her. She recounted, "And every time, I've had a new excuse of, I don't know how to use an e-mail, my phone can only hold six text messages, my phone was stolen, my SIM card was stolen." Garbutt also testified that

3

Mother had not complied with various aspects of her court-ordered service plan, including providing proof of employment, obtaining safe and stable housing, refraining from engaging in criminal activity (Mother was arrested twice during the case, once for theft and once for driving with an invalid license), and drug testing.

Regarding drug testing, Garbutt testified that she had requested 68 drug tests for Mother, most of which Mother did not complete. Garbutt explained, "She's completed nine. Four have been negative, four have been positive, and one she did not provide enough urine sample." Copies of the drug tests were admitted into evidence. The positive tests were positive for methamphetamine, amphetamines, and, on one occasion, marijuana. Garbutt also had concerns that Mother had tampered with some tests because on one occasion, Mother's hair-follicle test came back negative even though her urine sample was positive. Garbutt believed Mother was altering her hair: "She tends to let it grow out before court and we see a lot of gray. And then during the in-between, there is no gray in her hair." Garbutt also noted that Mother had failed to provide documentation verifying that she had attended any substance-abuse treatment programs.

Garbutt testified that Mother had completed parenting classes and had attended most of her visits with Adam, although she faulted Mother for arriving late to visits and for giving Adam "false hope" of positive outcomes that Mother could not guarantee, such as him returning to live with her. However, Garbutt acknowledged that "[o]verall, they have a very positive interaction."

Garbutt further testified that Adam was doing "amazing" in the home of Paternal Aunt, where he had been placed throughout the case. She elaborated, "He's—he's doing really well. He really struggled in the beginning during his change because he didn't have that routine.

4

His grades were struggling. I mean, he's making straight A's, or A's and B's. He's involved in track and football. He plays basketball. He got student of the month." Garbutt believed that Paternal Aunt was best suited to provide long-term care for Adam. She acknowledged that Adam had told her that he wanted to be with both Mother and Paternal Aunt, but she believed that Adam had "a more maternal bond" with Paternal Aunt than he did with Mother. She explained, "[Mother] can be fun and in your face, and that's super fun. But when he's crying, he goes to [Paternal Aunt]." Garbutt added that Paternal Aunt was most able to provide for Adam's immediate needs, and she had no concerns with her ability to provide for his future needs.

Paternal Aunt testified that Adam had lived with her on and off throughout his life and that her bond with Adam was "like . . . having another child." Although Adam was her nephew, she treated him as if he is her "own child." She testified, "We've always had a good relationship" and that "it's always emotional when we're separated and then we get back together." Paternal Aunt characterized Adam as "a very sweet, loving child," although "he can have his times where he can get upset, where he has a meltdown," which she attributed to Adam feeling as if he had to choose between Mother and Father. She explained, "I think he doesn't want to have to choose between the two because he loves them so much." Paternal Aunt did not think that "all this back and forth with CPS" was healthy for Adam, and she wanted him to be in the "stable, safe environment" that she had provided for him. However, Paternal Aunt acknowledged that Adam loved Mother, that he enjoyed his visits with her, and that "[h]is bond with his mother means a lot."

CASA volunteer McCarty, who had been assigned to the case since March 2024, testified that in his opinion, it would be in Adam's best interest to remain with Paternal Aunt, who had been "the most consistent" and stable caretaker in Adam's life. McCarty explained that

he had not seen consistency or stability from Mother, either in her employment or housing situations. He acknowledged, however, that Adam's visits with Mother "go great" and that Adam loves Mother and does not want her rights terminated. Nevertheless, McCarty expressed concerns with Mother's positive drug tests, her tendency to make promises to Adam that she might not be able to keep, and her refusal to follow court orders.

Mother testified that she had three children, two older daughters and Adam. Her parental rights to her daughters had been terminated in a previous CPS case following her arrest for driving while intoxicated and her testing positive for benzodiazepines, amphetamines, and methamphetamine. Mother acknowledged that this was her third CPS case involving Adam and that the other two cases, from 2015 and 2020, also involved allegations of illegal drug use.[3]

When asked if she had complied with drug testing during this case, Mother testified, "I've tried the best I could." She acknowledged that she had tested positive for amphetamines and methamphetamine multiple times but blamed the positive tests on cough suppressants and other sinus medicine. She admitted that she smoked marijuana and thus was not surprised about testing positive for that, although she testified that she did not know that marijuana was illegal in Texas. Mother disputed Garbutt's contention that she had been asked to take 68 drug tests, believing that the number "was, like, 10 or 12" tests.

Mother testified that she had a "beautiful" relationship with Adam and that she "spend[s] as much time as [she] can with him." Mother explained that she was "very dedicated and devoted" to Adam, that she "participates with his schools, dances, anything she can help

---

[3] In the 2015 case, after Mother successfully completed protective parenting, individual therapy, and tested negative on all drug screens, the court ordered that Adam be returned to Mother. In the 2020 case (the one that was ultimately dismissed by this Court), in addition to allegations of illegal drug use, the Department also alleged physical abuse of Adam due to injuries sustained to his arm that did not heal properly while in Mother's care.

with," and that she "meet[s] with the teachers" to ensure that he does not fall behind in school. She added that she gives Adam "[a]nything he wants" and "reward[s] good behavior," and that as a result, Adam is "always a good boy because he knows he gets whatever he wants."

Mother further testified that she was currently living with her mother in a senior-living facility but that she intended to "get a house" with money that she earned from her employment. At the beginning of the case, Mother was employed by Wal-Mart but had lost that job and was now "self-employed doing apps and crafts." Mother testified that once this case was over, "I'm hoping—I'm praying that I can return to Wal-Mart."

Mother did not appear on the final day of trial, despite the district court giving her the opportunity to appear either in-person or via Zoom. However, Mother's counsel was present throughout the trial.

At the conclusion of trial, the district court found by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O). The district court further found by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest. *See id.* § 161.001(b)(2). In accordance with those findings, the district court terminated Mother's parental rights to Adam. The district court appointed Paternal Aunt sole managing conservator of Adam and appointed Father possessory conservator of Adam. This appeal by Mother followed.

7

After reviewing the entire record, the *Anders* brief submitted on Mother's behalf, and the arguments raised in Mother's pro se brief, we have found nothing in the record that might arguably support an appeal. We agree with counsel that the appeal is frivolous.

We affirm the order terminating Mother's parental rights.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed: October 2, 2025

8